**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLESSING INVESTMENT GROUP LG LLC, a Wisconsin limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> COOLFRAMES, LLC, a New York limited liability company; LEE WEISSMAN, and DAVID WEISSMAN, <br><br> Defendants. | Case No. <br><br> Jury Trial Demanded |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Blessing Investment Group LG LLC ("Blessing" or "Plaintiff"), by and through its counsel, Litico Law Group, brings this action against Defendants COOLFRAMES, LLC ("Coolframes" or the "Business"), Lee Weissman ("Lee"), and David Weissman ("David") (collectively, the "Defendants" or "Seller Parties"). In support, it alleges:

### INTRODUCTION

1.      This is an action to remedy a deliberate, $5,750,000 bait-and-switch. In December 2025, Plaintiff Blessing Investment Group LG LLC paid to purchase all of the assets of Coolframes, an eyewear e-commerce business, from Lee, David, and Coolframes. The premise of the transaction was simple: Blessing would pay for the business, and Defendants would transfer all of the assets and help Blessing begin to operate the business. Instead, Defendants took the money, secretly cloned and transferred the company's main asset, and systematically sabotaged the business they had just sold.

2.      The centerpiece of this deception was a covert data heist started less than three weeks before closing the transaction (the "Closing") and completed just days before. While finalizing the transaction and expressly certifying that all assets would be transferred "free and clear," Defendants

secretly provisioned a dedicated server (either on-premises in their brick-and-mortar store in NJ or elsewhere, possibly remote) for the specific purpose of capturing and retaining a fully operational copy of the Business's custom-built software platform, an asset specifically valued at $2,500,000 in the Asset Purchase Agreement (the "APA"). This proprietary software ran the entire e-commerce website and housed the company's complete customer database. Defendants sold it, accepted millions of dollars for it, and then kept a working copy that they continue to use to this day. Critically, Defendants executed the APA on December 11, 2025 and completed the server copy on December 13, 2025, two days before the Closing, meaning the theft occurred after Defendants had already signed the very agreement warranting these assets would be conveyed free and clear.

3.      Defendants' misconduct only escalated after the ink dried. Having received Blessing's cash, they immediately began cannibalizing the transferred business. On the very first day after Closing, Lee announced he would not honor his contractual obligation to provide transition consulting services, cutting off critical institutional knowledge. Furthermore, Defendants provided Blessing only approximately 3% of the inventory it agreed to transfer. It also received hundreds of thousands of dollars in payments for orders it didn't fill, leaving Blessing to provide hundreds of thousands of dollars in labor and materials to fill orders it was not paid for.

4.      Simultaneously, Defendants hijacked the brand and its digital footprint. They continue to operate their New Jersey retail store under the sold "Coolframes" trademark, actively diluting the brand's goodwill and confusing consumers. They have purposefully withheld administrative control over Coolframes' digital platforms, crucial for advertising, and, in a staggering display of bad faith, submitted an unauthorized access request to Blessing's Google Merchant Center *after* receiving a cease-and-desist letter from Blessing's transactional counsel. When not digitally trespassing, Defendants have physically trespassed onto Blessing's leased Brooklyn premises in direct defiance of express instructions not to.

5.      Defendants have treated a multi-million-dollar contract as a mere suggestion. Blessing brings this action to recover its substantial damages, to compel Defendants to surrender the assets and funds they stole, and to secure preliminary and permanent injunctive relief to halt Defendants' ongoing unlawful conduct.

## PARTIES

6.      Blessing (Blessing Investment Group LG LLC) is a limited liability company organized under the laws of the State of Wisconsin, with its principal address at 711 La Grange Drive, Lake Geneva, Wisconsin 53147. Plaintiff is managed by Dan Blessing. For purposes of diversity jurisdiction, Plaintiff is a citizen of Wisconsin.

7.      Defendant Coolframes (COOLFRAMES, LLC) is a limited liability company organized under the laws of the State of New York, with its registered address at 2907 Ocean Avenue, Brooklyn, New York 11235. Coolframes was engaged in the business of selling eyewear, including eyeglasses, sunglasses, and accessories, primarily through the e-commerce website www.coolframes.com. Coolframes is a citizen of New York for purposes of diversity jurisdiction.

8.      Defendant Lee (Lee Weissman) is an individual residing at 108 Janwich Drive, Morganville, New Jersey 07751. At all relevant times, Lee owned 50% of the membership interests in Coolframes, served as President and Manager of Coolframes, and was a "Seller Party" under the APA. Lee is a citizen of New Jersey for purposes of diversity jurisdiction.

9.      Defendant David (David Weissman) is an individual residing at 407 Georgetown Drive, Morganville, New Jersey 07751. At all relevant times, David owned 50% of the membership interests in Coolframes, served as Manager of Coolframes, and was a "Seller Party" under the APA. David is a citizen of New Jersey for purposes of diversity jurisdiction.

10.     Lee and David, together, owned 100% of Coolframes' membership interests at all relevant times, controlled all of Coolframes operations, and personally executed each of the agreements at issue in this action in their individual capacities as "Seller Parties."

## JURISDICTION AND VENUE

11.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over Blessing's claims arising under: the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*; the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.*; and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*

12.     This Court has supplemental subject matter jurisdiction over Blessing's state law claims pursuant to 28 U.S.C. § 1367(a), as those claims arise from the same common nucleus of operative facts as the federal claims.

13.     This Court independently has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Blessing is a citizen of Wisconsin. Coolframes is a citizen of New York. Lee and David are citizens of New Jersey. The amount in controversy substantially exceeds $75,000, exclusive of interest and costs, as Blessing asserts damages exceeding $4,000,000, plus attorneys' fees and costs.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims in this action occurred in this District. Specifically: Coolframes' principal assets were located at 2907 Ocean Avenue, Brooklyn, New York (within this District) at the time of the transaction; Blessing holds exclusive possession of those premises under a sublease with Coolframes ("Sublease"); the unauthorized entries occurred at those Brooklyn premises; the trademark infringement has caused and continues to cause injury to Blessing's business and goodwill centered in Brooklyn; and the trade secret misappropriation involved assets originating at, and belonging to, a business within this District.

15.     The contract, an Asset Purchase Agreement dated October 22, 2025 (the "Contract") and the Sublease are governed by New York Law. *See* APA § 7.6; Sublease § 7. The Consulting Agreement is also governed by the laws of New York. *See* Consulting Agreement § 8.

## FACTUAL ALLEGATIONS

### *The Business and the Parties*

16.     Coolframes was an eyewear e-commerce business operated by Lee and David at 2907 Ocean Avenue, Brooklyn, New York 11235 (the "Premises"). The Business primarily sold eyeglasses, sunglasses, frames, lenses, and accessories to retail consumers throughout the United States and internationally through its website at www.coolframes.com.

17.     Coolframes was commercially successful. Based on Coolframes' financial statements and tax returns provided to Blessing during due diligence, the Business generated gross exceeding $9,000,000 in 2024, with ordinary business income of approximately $739,378. The parties valued the goodwill of the Business at $2,675,000 in the APA's purchase price allocation.

18.     A core driver of the Business's operations and value was a custom-built, proprietary software platform (the "Software") that: powered the website at www.coolframes.com; managed all customer relationships and purchasing; processed all e-commerce transactions; maintained the Business's entire customer database; and provided the operational infrastructure for the Business's online sales activities. The parties allocated $2,500,000 of the $5,750,000 Purchase Price to the Software, reflecting its central importance to the Business. *See* APA Schedule 2.5.3.

19.     Lee and David each owned 50% of Coolframes' membership interests and, together, owned, controlled, and operated the Business in all material respects. Lee served as President and as a signatory officer. David served as Manager.

20.     In addition to the Brooklyn e-commerce business, Lee and David separately owned and operated a brick-and-mortar optical retail store at 3849 Route 9, Old Bridge, New Jersey

("Coolframes NJ"). Coolframes NJ operated under the trade names "Coolframes" and "Coolframes Eyewear" through an entity called Coolframes NJ LLC. The parties acknowledged the existence of Coolframes NJ in the APA, and the APA carved out Coolframes NJ's brick-and-mortar operations from the non-compete restriction. It also required Defendants to rename the store within 60 days of Closing.

### *The Letter of Intent and Due Diligence*

21.     In or around July 2025, Dan Blessing entered negotiations with Lee and David to acquire Coolframes. On July 8, 2025, Blessing presented a Letter of Intent ("LOI") to Lee and David, and on July 10, 2025, the parties executed the LOI.

22.     The LOI contemplated a total purchase price of $5,750,000 for substantially all of Coolframes' assets, including the Software, all intellectual property, customer lists, the Coolframes trademark, the website, all social media accounts, and all goodwill.

23.     During the due diligence period, Lee and David provided Blessing with Coolframes' financial statements (including Profit & Loss statements for 2022, 2023, and 2024), tax returns, a list of material suppliers, employee records, and other disclosures. Coolframes represented through these materials, and through the representations and warranties in the APA, that Coolframes was profitable, its assets were in good condition and free of encumbrances, all intellectual property (including the Software) was owned exclusively by Defendants and would be conveyed to Blessing, and that no material adverse changes, such as cloning and transferring the Software, had occurred since June 30, 2025.

### *The APA*

24.     On October 22, 2025, Blessing and Defendants executed the APA. A true and correct copy of which is attached hereto as Exhibit 1. Lee and David executed the APA individually and for Coolframes.

25.    Pursuant to the APA, Blessing agreed to purchase from Coolframes substantially all its assets (the "Purchased Assets"), including without limitation:

(a)  All equipment, furniture, fixtures, supplies, and electronic equipment, "including without limitation, computer software/hardware and files, online licenses and subscriptions utilized in or related to the Business" - expressly including the Software. *See* APA § 2.1(a).

(b)  All inventory. *See* APA § 2.1(b).

(c)  Customer lists, customer files, customer designs, and contact information. *See* APA § 2.1(d).

(d)  "All Business Intellectual Property, websites, domain names, social media accounts, and accompanying artwork and photographs" as listed in Schedule 2.1(g), including the domain name coolframes.com, the Instagram account @coolframeseyewear, the Facebook account coolframeseyewear, the TikTok account, and the YouTube channel. *See* APA §§ 2.1(g), Schedule 2.1(g).

(e)  Goodwill of the business. *See* APA § 2.1(h).

(f)  "All Works in Progress." *See* APA § 2.1(k).

(g)  "All Customer Deposits for orders/work not commenced or completed." *See* APA § 2.1(l).

26.    The Purchase Price was $5,750,000, payable as: (a) a $50,000 earnest money payment placed in escrow; (b) cash payment of $4,851,000 at Closing; (c) a "First Promissory Note" of $604,500 at 4.0% per annum, payable in 96 monthly installments beginning on the 25th month anniversary; and (d) a "Second Promissory Note" of $287,000 at 4.0% per annum, due in a single balloon payment on the 120th month anniversary. *See* APA § 2.5.

27.     The APA allocated the Purchase Price among the Purchased Assets as follows: Lab equipment ($200,000); Inventory: frames and lens ($250,000); Software ($2,500,000); Furniture ($20,000); Supplies ($5,000); Computers ($100,000); Goodwill ($2,675,000). *See* APA Schedule 2.5.3.

28.     The APA contained extensive, detailed representations and warranties by the Seller Parties, including:

(a) Inventory Warranty (§ 3.1.26): At Closing, Seller would deliver inventory with an aggregate market value of $250,000, including at least $225,000 in frames. All frames and lenses must be in new, unused condition, purchased within the last six months, and be best-selling items.

(b) Full Disclosure (§ 3.1.17): "No representation or warranty by any Seller Party in this Agreement . . . contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."

(c) Intellectual Property (§ 3.1.20): Seller was "the sole and exclusive legal and beneficial owner . . . of all right, title, and interest in and to the Intellectual Property Assets" and the Intellectual Property Assets were "free and clear of all Encumbrances." All filings and registrations were current and in full force and effect.

(d) Title to Assets (§ 3.1.3): Seller had "good, marketable and valid title to all of the Purchased Assets free and clear of all mortgages, liens, security interests, pledges, charges, claims, Encumbrances and restrictions of any nature whatsoever."

(e) No Material Adverse Change (§ 3.1.16 and § 3.1.8): Since June 30, 2025, there had been no Material Adverse Effect and the Business had been operated in the Ordinary Course of Business. Without limitation, Seller had not "sold, assigned,

licensed, leased, permitted to lapse, transferred or otherwise disposed of any of its . . . Intellectual Property or other intangible assets." *See* APA § 3.1.8(d).

29.    The APA contained material post-Closing covenants binding upon the Seller Parties:

(a)  Business Name Covenant (§ 5.5): The Seller Parties covenanted not to use the names "Cool Frames," "CoolFrames," or any similar name in any context over which they had control. Seller was required to file an amendment to its organizational documents within two (2) Business Days of the Closing Date. Seller further agreed to rename Coolframes NJ within sixty (60) days of Closing.

(b)  Non-Compete Covenant (§ 5.3.1(a)): For five (5) years following the Closing Date, the Seller Parties agreed not to "own, manage, control, operate, consult with, render services for, provide financing to, or join, control or participate in the ownership, management, operation or control of . . . any business within the World . . . if such business participates in the selling or supplying services in any manner competitive with the Business." (Coolframes NJ's existing brick-and-mortar operations were carved out from this restriction.)

(c)  Non-Solicitation Covenant (§ 5.3.1(b)): For five (5) years following the Closing Date, the Seller Parties agreed not to "engage, employ, solicit or contact . . . any Person who has been, at any time during the two (2) year period preceding such engagement [a] contractor to the Buyer."[1]

---

[1] At the time of execution, Defendants knew but did not disclose that the Business's on-site manager, Arnold, is David Weissman's brother-in-law. David and Arnold maintain a close personal relationship. David knew, or should have known, that this undisclosed familial relationship would create an inherent conflict with the non-solicitation covenant and impede Blessing's ability to enforce it, yet Defendants concealed this material fact throughout negotiations and closing.

(d) Non-Disparagement (§ 5.3.1(e)): For five (5) years, the Seller Parties agreed not to "make, publish or communicate to any Person . . . any defamatory or disparaging remarks, comments or statements concerning . . . the Buyer."

(e) Express Acknowledgment of Irreparable Harm (§ 5.3.6): The Seller Parties expressly acknowledged and agreed that "any breach by Seller of any of the provisions contained in this Section 5.3 would cause irreparable damage to the Buyer for which monetary damages and other remedies at law will not be adequate," and that Buyer would be entitled to injunctive relief "without having to demonstrate actual harm or the inadequacy of legal remedies or posting any bond or other surety."

(f) Confidentiality (§ 5.4): The Seller Parties agreed to treat all Confidential Information of the Business as confidential and to refrain from using it except in connection with post-Closing consulting services.

(g) Guaranty (§ 5.6): Lee and David each "irrevocably and unconditionally guaranty" to Buyer each and every obligation of Seller and the Seller Parties under the APA. Their liability under this guaranty is "joint and several, primary and absolute."

30. The APA contained a prevailing party attorneys' fees provision. *See* APA § 7.12 ("Buyer or Seller shall pay all reasonable attorneys' fees and costs incurred by the prevailing party in enforcing the terms and provisions of this Agreement").

### *The Consulting Agreement & Sublease*

31. Simultaneously with and as a condition of the Closing, the parties executed a Consulting Agreement dated December 15, 2025 (the "Consulting Agreement"), a true and correct copy of which is attached hereto as Exhibit 2. Pursuant to the Consulting Agreement:

(a) Lee and David agreed to provide Blessing, at no charge, a minimum of thirty (30) hours per week (between the two of them) of transition consulting services including reasonable transition assistance, knowledge transfer regarding customers, suppliers, operations, systems, and processes for the period beginning on the Closing Date and ending ninety (90) days thereafter (i.e., approximately March 14, 2026);

(b) Lee and David agreed to provide a minimum of ten (10) hours per week of consulting services for the period beginning 91 days after Closing and ending 180 days after Closing (approximately March 15, 2026 through June 13, 2026); and

(c) Lee and David agreed to provide consulting services via phone and email for the period beginning 181 days after Closing and ending twelve (12) months from the Closing Date.

32. The Consulting Agreement was entered into "in connection with the Asset Purchase Agreement dated October 22, 2025" and is likewise governed by New York law. *See* Consulting Agreement §§ 1, 8.

33. Simultaneously with and as a condition of the Closing, the parties executed a Commercial Sublease Agreement (the "Sublease"), a true and correct copy of which is attached hereto as Exhibit 3. The Sublease granted Blessing exclusive possession of the Premises at 2907 Ocean Avenue, Brooklyn, New York 11235. The Sublease provided for a rent-free period of six months from commencement (through approximately June 15, 2026 ) followed by a monthly gross rent of $1,800. No rights of access to the Premises were reserved by Seller or any Seller Party. The Sublease is governed by New York law. *See* Sublease §§ 1, 2, 7.

34. At or immediately prior to Closing, Coolframes executed and delivered to Blessing an assignment of the federally registered trademark "COOLFRAMES" (U.S. Serial Number 88379614)

(the "Trademark Assignment"). The Trademark Assignment was filed and recorded with the United States Patent and Trademark Office. Blessing is the sole and exclusive owner of the Coolframes mark.

## The Closing

35.     The Closing occurred on or about December 15, 2025 (the "Closing Date").

36.     At the Closing, Blessing paid Seller the full cash Closing sum of $4,851,000, together with the $50,000 earnest deposit. In addition, Blessing delivered the First Promissory Note ($604,500) and the Second Promissory Note ($287,000) (collectively, the "Promissory Notes"). In total, Blessing delivered consideration of $5,750,000 to Defendants.

37.     At the Closing, Defendants executed a bill of sale conveying all Purchased Assets, the Sublease, the Consulting Agreement, the Trademark Assignment, and other required deliverables. Lee and David each individually signed each of these documents in their capacity as "Seller Parties."

38.     Blessing has fully performed all of its obligations under the APA and all ancillary agreements.

## Pre-Closing Fraud – the Software Copy and Transfer

39.     After executing the APA on December 11, 2025, and before the December 15, 2025 Closing while simultaneously negotiating the final terms of the Closing and certifying to Blessing that all Intellectual Property Assets were being conveyed free and clear, Defendants provisioned a dedicated server (either on-premises at Coolframes NJ or remotely hosted) for the specific purpose of housing a complete, operational copy of the Software. On information and belief, this server copy was completed on December 13, 2025, just two days before the Closing Date.

40.     The Software placed on this covert server was the same custom-built proprietary platform (valued at $2,500,000 in the APA) that powered www.coolframes.com, processed all customer transactions, managed all customer relationships, and contained the entirety of the Business's customer database.

41.    Defendants executed this covert server installation deliberately, without the knowledge or consent of Blessing, while simultaneously making representations and warranties in the APA that the Intellectual Property Assets were being sold "free and clear" and that the Business had been operated "in the Ordinary Course of Business" since June 30, 2025. The covert server installation was neither ordinary nor disclosed.

42.    Defendants failed to disclose this server installation to Blessing at any point before or during the Closing. Blessing had no knowledge of the covert server or the Software copy prior to the Closing.

43.    After Closing, Blessing discovered that Defendants were using the Software (now Blessing's proprietary asset) at Coolframes NJ.

44.    Defendants' pre-Closing, covert copying of the Software constitutes: a knowing and deliberate false representation in the APA's warranties; the theft of intellectual property belonging to Blessing; and misappropriation of trade secrets through improper means.

45.    Upon information and belief, in connection with the SBA-financing of the transaction, Defendants made certifications and representations to the SBA and/or federal lending institutions in which they represented the completeness and accuracy of the APA and the transfer of all assets — certifications that were materially false.

**Defendants' post-Closing conduct**

*Refusal to Transfer Digital Accounts and Assets*

46.    As of the Closing, Blessing became the owner of all digital assets of the Business, including: the domain name www.coolframes.com; all Google accounts associated with the Business, including the Google Merchant Center (Merchant Center name: Cool Frames; Merchant Center ID: 106909155; Domain: www.coolframes.com); and all social media accounts listed in APA Schedule 2.1(g).

47.    In the more than fourteen weeks since the Closing, Defendants have systematically failed and refused to transfer complete control of all digital accounts and assets to Blessing. As of the date of this Complaint, Defendants have not transferred full administrative control of certain Google and other digital accounts to Blessing.

*Unauthorized Post-Cease-Desist Google Merchant Center Access Attempt*

48.    On March 17, 2026, Blessing's counsel sent a formal notice and cease and desist letter (the "Demand Letter") to Defendants and their counsel, Jeffrey Lehman, Esq. A true and correct copy of the Demand Letter is attached hereto as Exhibit 4. The Demand Letter explicitly demanded, among other things, that Defendants immediately cease all unauthorized access to Blessing's digital accounts and assets.

49.    On or about Friday, March 20, 2026, after receiving the Demand Letter, Lee Weissman, using the email address mjzgrouplic@gmail.com associated with his separate entity, MJZ Group LLC, submitted an unauthorized access request to Blessing's Google Merchant Center for www.coolframes.com, seeking access purportedly for the purpose of "add[ing] products" to Blessing's connected business profile.

50.    A true and correct screenshot of this access request, as received by Blessing, is attached hereto as Exhibit 5. The screenshot confirms:

(a)   The requestor was "Lee Weissman (mjzgrouplic@gmail.com)";

(b)   The requested access was to the Merchant Center for www.coolframes.com;

(c)   The Merchant Center name shown is "Cool Frames," the domain is "www.coolframes.com," and the Merchant Center ID is 106909155; and

(d)   The map embedded in the access request identifies the location associated with the request as "Coolframes Eyewear, 3849 US-9, Old Bridge, NJ 08857, United States" - Coolframes NJ.

51.     Lee had no authorization to access Blessing's Merchant Center. Blessing had not authorized, invited, or consented to this access attempt. This unauthorized access attempt occurred after Defendants had received a formal written cease and desist letter demanding they stop accessing Blessing's digital assets.

52.     Lee's access attempt demonstrates that Defendants were and are actively attempting to use and exploit Blessing's purchased digital assets and business infrastructure in furtherance of their competing operations at Coolframes NJ.

*Continued Trademark Infringement and Breach of Business Name Covenant*

53.     The 60-day deadline for Defendants to rename Coolframes NJ under APA § 5.5 expired on or about February 13, 2026.

54.     As of the date of this Complaint, and more than 40 days after that deadline, Defendants have failed to rename Coolframes NJ. Coolframes NJ continues to operate under the names "Coolframes " and "Coolframes Eyewear." Defendants continue to use signage, marketing materials, insurance documents, and business registrations bearing the Coolframes name, in willful violation of both APA § 5.5 and Blessing's trademark rights.

55.     Every day that Defendants continue to operate under the Coolframes name, they cause consumer confusion, dilute the value of Blessing's registered trademark, and damage the $2,675,000 in goodwill for which Blessing paid.

*Violation of Non-Compete and Non-Solicitation Covenants*

56.     Section 5.3.1(a) of the APA prohibits the Seller Parties, for five years, from participating in any business competitive with the Business in the e-commerce space.

57.     Defendants have breached this covenant by: (a) using the stolen Software at Coolframes NJ to operate e-commerce functions using Blessing's own proprietary platform, customer

data, and operational tools; and (b) operating Coolframes NJ under the Coolframes brand in a manner directly competitive with Blessing's e-commerce Business.

58.     Additionally, APA § 5.3.1(b) prohibits Defendants, for five years, from soliciting any person who was a contractor to the Business within the two years preceding the solicitation. Upon information and belief, Defendants have continued to engage at least two (2) 1099 independent contractors who previously performed services for the Business, in violation of this covenant. Among these individuals is Arnold, the Business's on-site manager, who is David Weissman's brother-in-law. Defendants concealed this familial relationship from Blessing throughout the transaction. David Weissman knew or should have known that the non-solicitation provision would directly implicate Arnold's continued engagement, yet executed the APA without disclosing this material fact, placing Blessing in an untenable position with respect to the management of its own business.

***Total Repudiation of the Consulting Agreement***

59.     The Consulting Agreement obligated Lee and David to provide a minimum of 30 hours per week of in-person transition consulting services during the first 90 days following Closing (a period that ran from approximately December 15, 2025 through March 14, 2026). This was followed by an obligation to provide 10 hours per week for the following 90 days (approximately March 15 through June 13, 2026).

60.     On the very first day after the Closing, Lee Weissman declared that he would not be available in person to provide consulting services as contractually required.

61.     In the months following the Closing, Lee and David systematically missed the majority of scheduled consulting meetings, refused to make themselves available, and failed to transition and migrate customer accounts, supplier relationships, operational processes, and systems knowledge to Blessing, causing direct financial harm in the form of lost sales and additional operational costs.

62. Lee and David have since expressly stated that they have no intention of honoring or complying with the Consulting Agreement - a complete, anticipatory repudiation of their contractual obligations.

63. The consulting services were provided at no additional charge and were a material inducement to Blessing's decision to purchase the Business for $5,750,000. The loss of these services has caused irreversible harm to Blessing's transition and ongoing operations.

*Wrongful Retention of Customer Deposits and Work-in-Progress Revenues*

64. The APA defined "Customer Deposit" as "any payment or payment obligations from a customer for any services not completed or any goods not delivered prior to the Closing Date," and required all such deposits to be assigned and transferred to Blessing at Closing. *See* APA §§ 1.1, 2.1(l), 2.3.

65. Between December 12 and December 14, 2025, the three days immediately preceding the December 15 Closing, Seller received credit card payments in excess of $47,000 from customers for orders that had not been completed or delivered as of the Closing Date. These payments were therefore Customer Deposits required to be transferred to Blessing at Closing.

66. Blessing completed and fulfilled these orders after the Closing at its own expense, including purchasing frames, lenses, and other materials and paying labor and shipping costs. Seller retained these credit card payments and has refused to remit them to Blessing despite repeated demands.

67. In addition, Seller received and wrongfully retained Customer Deposits in excess of $420,000 for orders that were not commenced or completed as of the Closing Date, which Blessing subsequently completed at its own expense after Closing. These Customer Deposits were contractually required to be assigned to Blessing at Closing and constitute Purchased Assets under the APA.

68.    In total, Defendants have wrongfully retained in excess of $467,000 in funds belonging to Blessing.

*Inventory Deficiency Discovered Post-Closing*

69.    APA § 3.1.26 warranted that Seller would deliver at Closing inventory valued at $250,000 in aggregate, including at least $225,000 in frames, all in new, unused condition, purchased within the last six months, and representing best-selling items.

70.    The inventory Seller delivered at Closing was deficient by $218,275.10 from the contractually warranted minimum.

71.    No adjustment was made to the Cash Closing Payment to account for this deficiency. Defendants have refused to pay the deficiency amount of $218,275.10.

*Repeated Trespass on Blessing's Premises*

72.    The Sublease granted Blessing exclusive possession of the Premises at 2907 Ocean Avenue, Brooklyn, New York 11235, with no rights of access reserved by Seller or any Seller Party.

73.    Notwithstanding Blessing's exclusive possessory rights, Lee and/or David physically entered the Premises on multiple occasions without Blessing's authorization or consent.

74.    On or about Sunday, January 18, 2026, Lee entered the Premises without authorization, used Blessing's laboratory equipment without permission, and in doing so broke the LCD display screen on the blocker, a piece of optical laboratory equipment essential to daily operations. Lee did not notify Dan Blessing or any representative of Blessing of this incident; Blessing learned of it the following day from its on-site manager. As a direct result of the damage, the laboratory was forced to close for the majority of the week, during which Blessing continued to pay employee wages for idle workers, customer orders sat unfulfilled, and Blessing was required to issue discounts and refunds to affected customers to mitigate the resulting loss of goodwill.

75.    On a separate documented occasion, Lee Weissman was expressly directed not to enter the Premises. Lee responded, in writing, that he did not care whether Blessing objected and that he intended to enter and use the equipment regardless. Lee thereafter entered the Premises in willful disregard of Blessing's exclusive possessory rights. True and correct copies of these written communications are attached hereto as Exhibit 6.

*Defendants' Failure to Cure Despite Demand*

76.    By the Demand Letter dated March 17, 2026, *see* Ex. 4, Blessing's counsel demanded that Defendants: (a) immediately pay the $218,275.10 inventory deficiency; (b) immediately cease use of the Coolframes name and provide evidence of the name change; (c) immediately pay the $47,000+ in retained work-in-progress revenues; (d) immediately account for and transfer all Customer Deposits; (e) immediately cease unauthorized access to the Premises; and (f) immediately comply with all other obligations under the APA, Consulting Agreement, and Sublease.

77.    On March 20, 2026, Defendants' counsel, Jeffrey Lehman, responded that Defendants were still "reviewing" the allegations and needed "additional time to respond" - while simultaneously attempting to redirect attention to rent under the Sublease (which is not due until June 15, 2026). A true and correct copy of this response is attached hereto as Exhibit 7.

78.    On March 23, 2026, Blessing's counsel sent a follow-up communication informing Defendants of the documented unauthorized Google Merchant Center access attempt and placing Defendants on notice that "there is a digital record of their activities."

79.    As of the date of this Complaint, Defendants have cured none of the identified breaches.

## CAUSES OF ACTION

### COUNT I
### Breach of Contract - APA (Inventory Warranty Deficiency)
### Against All Defendants

80.     Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

81.     The APA is a valid, binding, and enforceable contract under New York law. Blessing fully performed all of its obligations under the APA.

82.     Section 3.1.26 of the APA constitutes a specific, material warranty by Seller that inventory valued at $250,000 (with at least $225,000 in frames, all new, current, and best-selling) would be delivered at Closing.

83.     Seller breached this warranty by delivering inventory deficient by $218,275.10.

84.     As a direct and proximate result of this breach, Blessing has suffered damages of not less than $218,275.10, plus consequential damages.

85.     Lee and David are jointly and severally liable pursuant to APA § 5.6.

## COUNT II
### Breach of Contract - APA (Wrongful Retention of Customer Deposits and WIP Revenues) Against All Defendants

86.     Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

87.     APA §§ 1.1, 2.1(l), and 2.3 required all Customer Deposits for orders not commenced or completed as of the Closing Date to be assigned and transferred to Blessing at Closing, and treated as Purchased Assets.

88.     Defendants retained in excess of $47,000 in pre-Closing credit card payments for work Blessing subsequently completed at its own expense, and in excess of $420,000 in Customer Deposits, all in breach of the APA.

89.     As a direct and proximate result of this breach, Blessing has suffered damages in excess of $467,000, plus the costs and expenses Blessing incurred completing the associated orders.

90.     Lee and David are jointly and severally liable pursuant to APA § 5.6.

## COUNT III
### Breach of Contract - APA (Business Name Covenant)
### Against All Defendants

91.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

92.    APA § 5.5 required Seller and all Seller Parties to immediately cease using the Coolframes name and to rename Coolframes NJ within 60 days of Closing (by approximately February 13, 2026).

93.    Defendants breached this covenant by failing to rename Coolframes NJ and by continuing to operate under the Coolframes name in every material respect through the date of this Complaint.

94.    As a direct and proximate result of this ongoing breach, Blessing has suffered and continues to suffer damages, including irreparable harm to the goodwill and brand value of the Coolframes mark, for which $2,675,000 in consideration was paid.

95.    Monetary damages alone are inadequate. Blessing is entitled to injunctive relief, as anticipated by the APA, compelling immediate compliance with § 5.5.

## COUNT IV
### Breach of Contract - APA (Non-Compete and Non-Solicitation Covenants)
### Against All Defendants

96.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

97.    APA §§ 5.3.1(a) and (b) impose five-year non-compete and non-solicitation obligations on the Seller Parties.

98.    Defendants breached these covenants by: (a) using the stolen Software to conduct competitive e-commerce activities at Coolframes NJ; (b) operating a business competitive with

Blessing's e-commerce business; and (c) continuing to engage independent contractors previously engaged by the Business in violation of the non-solicitation covenant.

99.     As expressly acknowledged in APA § 5.3.6, these breaches cause irreparable harm for which monetary damages are inadequate and Blessing is entitled to injunctive relief without bond or surety.

## COUNT V
### Breach of Contract - APA (Failure to Transfer Digital Assets and Software)
### Against All Defendants

100.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

101.    The APA required Seller to transfer all Business Intellectual Property, software, websites, domain names, and digital accounts to Blessing at Closing, free and clear of all encumbrances. *See* APA §§ 2.1(a), (g); 4.2.8(d), (f).

102.    Defendants breached these obligations by: (a) covertly copying and retaining the Software before Closing; (b) continuing to use the Software post-Closing; (c) failing to transfer full control of all digital accounts and assets; and (d) attempting unauthorized access to Blessing's Google Merchant Center after Closing.

103.    As a direct and proximate result of this breach, Blessing has been deprived of exclusive use and enjoyment of assets purchased for, and allocated, $2,500,000, and has suffered ongoing harm to its competitive position and customer data security.

## COUNT VI
### Breach of Contract - Consulting Agreement
### Against Lee Weissman and David Weissman

104.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

105. The Consulting Agreement is a valid, binding, and enforceable contract under New York law. Lee and David are parties to the Consulting Agreement.

106. Lee and David materially breached the Consulting Agreement by: (a) Lee declaring on the first day after Closing Date that he would not appear in person as required; (b) both Lee and David systematically missing the majority of scheduled meetings and making themselves unavailable; (c) failing to transition accounts, supplier relationships, operational knowledge, and systems to Blessing; and (d) expressly stating they have no intention of complying with the Consulting Agreement - constituting total anticipatory and actual repudiation under New York law.

107. As a direct and proximate result of this repudiation and breach, Blessing has suffered damages including lost profits, additional operational costs, and ongoing harm from the failure to transfer critical institutional knowledge about the Business.

## COUNT VII
### Breach of Contract - Sublease
### Against Lee Weissman and David Weissman

108. Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

109. The Sublease is a valid, binding contract granting Blessing exclusive possession of the Premises, with no reserved access rights for Seller or any Seller Party.

110. Defendants Lee and David breached the Sublease by entering the Premises on multiple occasions without authorization, and particularly by entering after Lee was explicitly directed not to do so.

111. As a direct and proximate result, Blessing has suffered damages including compromise of the security of its business premises, operations, employees, and records; physical damage to Blessing's laboratory equipment (the blocker LCD display); lost revenue from the forced closure of

the laboratory for approximately one week; wages paid to idle employees during the closure; customer discounts and refunds necessitated by unfulfilled orders; and loss of customer goodwill.

## COUNT VIII
### Breach of Representations and Warranties - APA
### Against All Defendants

112.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

113.    The following representations and warranties were materially false at the time made:

(a) The § 3.1.17 Full Disclosure warranty was false, as Defendants had secretly retained a copy of the Software while representing the contrary;

(b) The § 3.1.20 Intellectual Property warranty was false, as Defendants had covertly ensured the Software would not be fully and exclusively conveyed to Blessing;

(c) The § 3.1.26 Inventory warranty was false, as the inventory delivered was deficient by $218,275.10;

(d) The § 3.1.8 No Material Adverse Change warranty was false, as Defendants' pre-closing server installation constituted a material, undisclosed change in the nature and condition of the IP assets; and

(e) The § 3.1.3 Title warranty was false, as Defendants retained a copy of the Software, preventing conveyance of the Purchased Assets "free and clear."

114.    Blessing reasonably and justifiably relied upon these representations in paying $5,750,000 at Closing.

115.    As a direct and proximate result of these false representations, Blessing has suffered damages to be proven at trial, including the full value of the assets improperly retained and the harm caused to Blessing's business by Defendants' ongoing conduct.

## COUNT IX
### Federal Trademark Infringement - Lanham Act (15 U.S.C. § 1114)

**Against All Defendants**

116.    Blessing incorporates and re-alleges paragraphs 1 through 78 as though fully set forth herein.

117.    Blessing owns the registered trademark Coolframes (U.S. Serial No. 88379614), which was validly assigned to Blessing and recorded with the USPTO. The mark is valid, subsisting, and enforceable.

118.    Defendants are using the marks "Coolframes," "Coolframes," "Coolframes Eyewear," and "Coolframes NJ LLC" in commerce in connection with optical goods and services - goods and services identical to those covered by Blessing's registered mark - without authorization from Blessing.

119.    Defendants' unauthorized use creates a likelihood of confusion, mistake, or deception as to the source, sponsorship, or affiliation of the goods and services offered by Coolframes NJ.

120.    Defendants' infringement is willful: Defendants signed the trademark assignment; Defendants signed the Business Name Covenant; Defendants received the Demand Letter; and Defendants nonetheless continue to trade under the Coolframes name.

121.    As a direct result of Defendants' infringement, Blessing has suffered irreparable harm to the goodwill and commercial value of the Coolframes mark, for which $2,675,000 in consideration was paid. Monetary damages alone are inadequate.

122.    Blessing is entitled to: injunctive relief (15 U.S.C. § 1116); Defendants' profits, Blessing's damages, and costs (15 U.S.C. § 1117(a)); and in the Court's discretion, treble damages and attorneys' fees for willful infringement (15 U.S.C. § 1117(a)).

**COUNT X**
**Misappropriation of Trade Secrets - Defend Trade Secrets Act (18 U.S.C. § 1836)**
**Against All Defendants**

123.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

124.    The Software - the custom-built, proprietary e-commerce platform powering www.coolframes.com and containing the Business's customer database - constitutes a "trade secret" within the meaning of 18 U.S.C. § 1839(3): it derives independent economic value (as evidenced by its $2,500,000 purchase price allocation) from not being generally known or ascertainable by others; and it was subject to reasonable measures to maintain its secrecy, including sale for $2,500,000 and confidentiality obligations in the APA.

125.    The Software is used in and related to products and services used in interstate and international commerce.

126.    Defendants misappropriated the Software through "improper means" (18 U.S.C. § 1839(6)) by covertly and without authorization installing a dedicated server to copy the Software in the weeks before Closing - while simultaneously representing to Blessing that the Software was being sold free and clear - and by continuing to use it at Coolframes NJ after Closing, without consent.

127.    Defendants' misappropriation was willful and malicious, as evidenced by its premeditated, covert nature and its continuation in the face of Blessing's demands.

128.    Blessing is entitled to damages (actual loss and unjust enrichment), injunctive relief (18 U.S.C. § 1836(b)(3)(A)), and exemplary damages of up to two times the compensatory damages (18 U.S.C. § 1836(b)(3)(C)) and attorneys' fees (18 U.S.C. § 1836(b)(3)(D)) for willful and malicious misappropriation.

## COUNT XI
### Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030)
### Against Lee Weissman

129.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

130.    Blessing's Google Merchant Center account for www.coolframes.com (Merchant Center ID: 106909155) constitutes a "protected computer" under 18 U.S.C. § 1030(e)(2) as it is used in and affecting interstate commerce.

131.    After Closing, and after receiving Blessing's formal written cease and desist letter on March 17, 2026, Lee Weissman, without authorization, submitted an access request to Blessing's Google Merchant Center seeking "Standard" access, using the email address mjzgrouplic@gmail.com, for the stated purpose of adding products to Blessing's Business Profile. As established by the screenshot attached as Exhibit 5, this access attempt was made from Coolframes NJ location.

132.    This unauthorized access attempt constitutes a violation of 18 U.S.C. § 1030(a)(2) (unauthorized access to obtain information from a protected computer) and § 1030(a)(5) (knowingly causing damage to a protected computer system).

133.    Blessing has suffered damage and loss as a result of Lee's unauthorized access and access attempt, including costs incurred to investigate, secure, and remediate Blessing's digital systems, and has suffered or will suffer losses exceeding $5,000 in any one-year period, satisfying the jurisdictional threshold of 18 U.S.C. § 1030(c)(4)(A)(i).

## COUNT XII
### Fraud / Fraudulent Misrepresentation
### Against All Defendants

134.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

135.    In the weeks immediately preceding the Closing, Defendants made material representations to Blessing through the APA's warranties and through affirmative statements and disclosures that: all Intellectual Property Assets were owned exclusively by Seller and being conveyed to Blessing free and clear; no material adverse changes had occurred since June 30, 2025; and the Business had been operated in the Ordinary Course of Business.

136. These representations were false. At the very time Defendants were making these representations, they were secretly installing a dedicated server to capture and retain the Software, a $2,500,000 asset, in deliberate preparation to continue using it after Closing.

137. Defendants knew these representations were false when made. The server installation was deliberate, covert, and planned specifically to enable Defendants to retain and exploit assets they were selling.

138. Defendants made these false representations with the intent to induce Blessing to proceed with the Closing and deliver $5,750,000 in consideration.

139. Blessing reasonably and justifiably relied on Defendants' representations in proceeding to Closing and making full payment.

140. As a direct and proximate result of Defendants' fraud, Blessing has suffered damages including the value of the misappropriated Software ($2,500,000), the harm caused to its competitive position, and all other damages flowing from the fraudulent scheme.

## COUNT XIII
### Common Law Conversion
### Against All Defendants

141. Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

142. As of the Closing, Blessing is the rightful owner of: the Software; the Business's customer data; all digital accounts; the $467,000+ in Customer Deposits; and all other Purchased Assets.

143. Defendants are wrongfully and without legal justification exercising dominion and control over Blessing's property including the Software, the customer data, the digital accounts, and the Customer Deposits to the exclusion of Blessing's rights as the rightful owner.

144. Blessing has demanded return of these assets. Defendants have refused.

145.    As a direct and proximate result, Blessing has suffered damages in an amount to be determined at trial.

## COUNT XIV
### Trespass to Land
### Against Lee Weissman and David Weissman

146.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

147.    Pursuant to the Sublease, Blessing holds exclusive possession of the Premises at 2907 Ocean Avenue, Brooklyn, New York 11235. No access rights were reserved for Seller or any Seller Party.

148.    Defendants Lee and David physically entered the Premises on multiple occasions without Blessing's authorization or consent, including on one documented occasion after Lee was expressly directed not to enter.

149.    Defendants' unauthorized entries constitute common law trespass to land under New York law.

150.    As a direct and proximate result, Blessing has suffered damages including harm to the security and integrity of its business premises and operations and downtime that resulted in lost business resulting from broken equipment.

151.    Blessing is entitled to an injunction permanently enjoining Defendants from entering or accessing the Premises without prior written authorization.

## COUNT XV
### Unjust Enrichment
### (Pleaded in the Alternative)
### Against All Defendants

152.    Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

153. This Count is pleaded in the alternative, to the extent any contractual claim fails on technical grounds.

154. Blessing conferred a benefit upon Defendants of $5,750,000 at Closing. Defendants were enriched by retaining and using assets sold including the Software, Customer Deposits, and digital accounts and by failing to perform consulting obligations for which they were compensated by the overall Purchase Price.

155. Equity and good conscience require that Defendants disgorge the value of this unjust enrichment.

## COUNT XVI
### Contractual Indemnification - APA § 6.1
### Against All Defendants

156. Blessing incorporates and re-alleges paragraphs 1 through 79 as though fully set forth herein.

157. APA § 6.1 requires the Seller Parties to jointly and severally indemnify, defend, and hold harmless Blessing from all losses, damages, costs, liabilities, and expenses - including reasonable attorneys' fees - arising from: any breach of representations, warranties, covenants, or agreements; any pre-Closing ownership and operation of the Business; any liability of Seller; and any failure by any Seller Party to perform any term or covenant of the APA.

158. All breaches described herein trigger the indemnification obligation of APA § 6.1.

159. Blessing has incurred and continues to incur losses, damages, costs, and attorneys' fees as a direct result of the foregoing, all of which are recoverable under § 6.1.

### PRAYER FOR RELIEF

WHEREFORE, Blessing Investment Group LG LLC respectfully requests that this Court enter judgment in its favor against Defendants Coolframes, LLC, Lee Weissman, and David Weissman, jointly and severally, granting the following relief:

(a) Emergency / Injunctive Relief: A Temporary Restraining Order, and upon hearing, a Preliminary and Permanent Injunction, ordering Defendants, their agents, servants, employees, and all persons acting in active concert or participation with them, to:

1. Immediately cease all use of the Coolframes trademark, name, logo, or any confusingly similar designation, in any medium, at any location, including but not limited to Coolframes NJ at 3849 Route 9, Old Bridge, New Jersey, and to immediately effect a name change of that store;

2. Immediately cease all use, possession, and operation of the Software and any copy or derivative thereof, and to surrender to Blessing all server hardware, storage media, and other systems on which any copy of the Software resides;

3. Immediately transfer and surrender to Blessing full administrative control over all digital accounts, online platforms, social media accounts, Google accounts (including the Google Merchant Center, Merchant Center ID 106909155, for www.coolframes.com), and all other digital assets associated with the Business;

4. Immediately cease any access or attempted access to Blessing's computer systems, servers, accounts, and digital assets;

5. Immediately cease all physical access to the Premises at 2907 Ocean Avenue, Brooklyn, New York 11235 without prior written consent of Blessing;

6. Immediately cease the solicitation or engagement of any contractor or employee previously engaged by the Business;

7. Preserve and produce all business records, server contents, digital files, software code, customer data, and other evidence relevant to this action (preservation and anti-spoliation order).

(b) Compensatory Damages in an amount to be proven at trial, including but not limited to:

1. Not less than $218,275.10 for the inventory deficiency;

2. Not less than $467,000 for the wrongfully retained Customer Deposits and work-in-progress revenues, plus the costs and expenses Blessing incurred completing associated orders;

3. The full value of the misappropriated Software ($2,500,000 as allocated in the APA), plus lost profits and competitive harm attributable to Defendants' ongoing unauthorized use;

4. Damages for failure to provide contractually required consulting services;

5. All consequential and incidental damages arising from the foregoing;

(c) Trademark Damages pursuant to 15 U.S.C. § 1117(a): Defendants' profits attributable to the infringing use of the Coolframes mark; Blessing's actual damages; the costs of this action; and, given the willfulness of Defendants' infringement, treble damages in the Court's discretion;

(d) Trade Secret Damages pursuant to 18 U.S.C. § 1836(b)(3): actual loss caused by the misappropriation; unjust enrichment not captured by actual loss; and/or a reasonable royalty for Defendants' unauthorized use; plus exemplary damages of up to two times the compensatory amount for willful and malicious misappropriation;

(e) Attorneys' Fees and Costs pursuant to APA § 7.12 (prevailing party provision), 15 U.S.C. § 1117(a) (Lanham Act), 18 U.S.C. § 1836(b)(3)(D) (DTSA), and as otherwise permitted by law;

(f) Pre-judgment and Post-judgment Interest on all amounts awarded;

(g) Specific Performance ordering Defendants to comply in full with the Consulting Agreement and all remaining obligations under the APA, including the immediate transfer of all digital accounts and assets to Blessing;

(h) Disgorgement of all profits, benefits, and unjust enrichment obtained by Defendants as a result of their wrongful conduct;

(i) Attorneys' fees and costs;

(j) Punitive damages of at least $1,000,000; and

(k) Such Other and Further Relief as this Court deems just and proper.

Respectfully submitted,

Blessing Investment Group LG LLC

/s/ Matthew A. Wood
Matthew A. Wood
David K. Radkin
Litico Law Group
3701 Algonquin Road, Suite 450
Rolling Meadows, Illinois 60008
dkr@litico.law
maw@litico.law
(847) 307-5942
*Attorneys for Blessing Investment Group LG, LLC*
*Admission pro hac vice anticipated/forthcoming.*

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Blessing demands a trial by jury on all issues so triable.

Respectfully submitted,

Blessing Investment Group LG LLC

/s/ Matthew A. Wood
Matthew A. Wood
David K. Radkin
Litico Law Group
3701 Algonquin Road, Suite 450
Rolling Meadows, Illinois 60008
dkr@litico.law
maw@litico.law
(847) 307-5942
*Attorneys for Blessing Investment Group LG, LLC*

## VERIFICATION

I, Dan Blessing, as Manager of Blessing Investment Group LG LLC, the Plaintiff in this action, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint, that I am familiar with the facts stated therein, and that to the best of my knowledge, information, and belief, the allegations therein are true and correct.
March 30, 2026.

*Dan Blessing*

Signer ID: FGN0LBOP19
Dan Blessing, Manager
Blessing Investment Group LG LLC

Page 34 of 34

Document ID: 7bb7d5277b97169a53a343ef4ad36e2f825fc26928c093e5a0a92354606e42c1