**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT (this "**Agreement**") dated October 22, 2025, by and between Blessing Investment Group LG LLC or its nominee (the "**Buyer**"), and COOLFRAMES, LLC, a New York limited liability company ("**Seller**"), Lee Weissman, individually ("**Lee**"), and David Weissman ("**David**") (Seller, Lee, and David collectively, the "**Seller Parties**"). Each of Buyer, Seller, Lee and David being a "**Party**," and together, the "**Parties**."

RECITALS

WHEREFORE, Seller is a State of New York Limited Liability Company, engaged in the business of selling eyewear, such as eye and sunglasses (the "**Business**") and is located at 2907 Ocean Ave, Brooklyn, New York 11235 (the "**Premises**");

WHEREFORE, Buyer is will be a Wisconsin Limited Liability that at the time of Closing and will be a foreign entity authorized to do business in New York desires to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the assets used in the operation of the Business for the consideration, on the terms, and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the recitals and the mutual promises, covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

AGREEMENTS

**ARTICLE I**
DEFINITIONS

**SECTION 1.1**  Definitions. In addition to the capitalized terms elsewhere defined herein, the following terms, when used herein, shall have the following meanings:

"**Closing**" shall mean the closing of the transactions contemplated by this Agreement, such closing to occur on the Closing Date by electronic exchange of documents between Buyer and Seller.

"**Closing Date**" shall mean November 19th, 2025, unless otherwise agreed to by the Parties.

"**Confidential Information**" means any information concerning the Business or Seller that is not generally available to the public, including but not limited to trade secrets and proprietary information of any Seller.

"**Contract**" or "**Contracts**" shall mean any contract, agreement, instrument, commitment or understanding of any nature (both written and oral) to which Seller is a party or under which Seller receives a benefit or by which Seller or any of its assets are bound or subject, including

1

Exhibit 1

without limitation, any license agreement, security agreement, indemnity agreement, subordination agreement, mortgage, equipment lease or other lease or sublease (whether or not capitalized), conditional sale or title retention agreement, sales representative agreement, distribution agreement, retailer agreement, advertising agreement, purchase order or other agreement.

"**Customer Deposit**" shall mean any payment or payment obligations from a customer for any services not completed or any goods not delivered prior to the Closing Date.

"**Employee Benefit Plan**" means any severance pay, employment, consulting, transaction bonus, change in control bonus, bonus, matching gift, tuition reimbursement, retention, deferred compensation, incentive compensation, commission, employee loan, collective bargaining, stock purchase, stock option or other equity-based compensation, leave of absence, layoff, vacation, death benefit, medical, dental, disability, workers' compensation or other insurance, accident, life, Code §125 "cafeteria" or "flexible" benefit, pension, savings, profit-sharing or retirement plan, program, practice, policy or arrangement of any kind, whether formal or informal, written or oral, funded or unfunded, qualified or non-qualified (including any "employee benefit plan" within the meaning of ERISA §3(3)) (i) that any Seller or any ERISA Affiliate sponsors or maintains with respect to any current or former Employees, directors, independent contractors or other service providers of any Seller or any ERISA Affiliate, (ii) to which any Seller or any ERISA Affiliate contributes or has an obligation to contribute with respect to current or former Employees, directors, independent contractors or other service providers of any Seller or ERISA Affiliate or (iii) with respect to which any Seller or any ERISA Affiliate may otherwise have any Liability, whether direct or indirect, including any such plan, program, practice, policy or arrangement previously maintained by any Seller or any ERISA Affiliate.

"**Encumbrance**" shall mean any encumbrance, lien, charge, claim, community property interest, condition, equitable interest, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means each Entity which is, or was at the relevant time, treated as a single employer with any Seller for purposes of Code §414 or ERISA § 4001(b)(1) or that is, or was at the relevant time, a member of the same "controlled group" as any Seller pursuant to ERISA §4001(a)(14).

"**GAAP**" means United States generally accepting accounting principles in effect from time to time.

"**Governmental Body**" shall mean any:

(a) nation, state, county, city, municipality, town, village, district or other jurisdiction of any nature;

Exhibit 1

(b)  federal, state, local, municipal, foreign, or other government, including any agencies of said governments exercising the powers possessed by said governments;

(c)  governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or

(d)  body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

"**Intellectual Property**" means all intellectual property and industrial property rights and assets, including all patents and patent applications, trademarks and trademark applications, copyrights, trade names (including the name of Seller), know-how, trade secrets, software, domain names, email addresses, telephone numbers and facsimile numbers, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and/or used in or necessary for the conduct of the Business as currently conducted.

"**Inventory**" shall mean raw material inventory, finished goods inventory, samples, spare parts, supplies, works in process, and all inventory of Seller, except such inventory which Buyer designates as excluded.

"**Knowledge**" or any or similar knowledge qualification, means Seller, Lee, or David (a) has actual knowledge of such fact or matter or (b) would reasonably be expected to have knowledge of such fact or matter after reasonable investigation.

"**Liability**" and "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Law**" or "**Laws**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other similar requirement or rule of law of any Governmental Body.

"**Legal Requirement**" shall mean any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, permit, license, statute or treaty. The foregoing shall be deemed to include laws and regulations relating to the federal patent, copyright, and trademark laws, state trade secret and unfair competition laws.

"**Material Adverse Effect**" shall mean any event, circumstance, effect, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, (a) materially adverse to the Business, results of operations, financial condition, assets, liabilities, or prospects, or (b) has materially impaired, or would reasonably be expected to

3

Exhibit 1

materially impair, any Seller's ability to effect the Closing or any Seller's ability to perform their respective obligations under this Agreement.

"**Ordinary Course of Business**" shall mean the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"**Permitted Encumbrances**" means any of the following: (i) any liens for Taxes and assessments of a Governmental Body not yet due and payable or that are being contested in good faith and by appropriate proceedings if adequate reserves are maintained in accordance with GAAP and are included on the Most Recent Financial Statements; (ii) liens of mechanics, materialmen, carriers, warehousemen or processors of labor, materials or supplies incurred in the Ordinary Course of business (A) in connection with obligations that are not overdue for a period of more than 30 days or (B) that are being contested in good faith and by appropriate proceedings if adequate reserves are maintained in accordance with GAAP and are included on the Most Recent Financial Statements; and (iii) easements, zoning and similar restrictions that do not materially interfere with the conduct of the Business in the Ordinary Course of business.

"**Person**" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity (or any department, agency, or political subdivision thereof) or other entity.

"**Tax**" or "**Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, commercial activity, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, escheat or unclaimed property, accumulated earning, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Works in Progress**" means (i) Seller's jobs that are contracted for and open and ongoing but not completed prior to Closing, (ii) Seller's jobs that are contracted for but not open or begun prior to Closing, and (iii) Seller's executed maintenance contracts and design agreements that are existing but not completed prior to Closing.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

**SECTION 2.1**  Assets to be Sold.  Upon the terms and subject to the conditions herein set forth, at the Closing, Seller shall sell and assign to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances (other than Permitted Encumbrances), in consideration of the Purchase Price, the right, title and interest in, to and under all the following assets of Seller (the "**Purchased Assets**"):

Exhibit 1

(a)    All equipment, furniture, fixtures, supplies, and electronic equipment owned by the Seller, including without limitation, computer software/hardware and files, online licenses and subscriptions utilized in or related to the Business;

(b)    All Inventory as listed on Schedule 2.1(b);

(c)    Leasehold improvements;

(d)    Customer lists, customer files, customer designs, and contact information;

(e)    All vendor and supplier agreements, contacts, and pricing (the "**Assigned Contracts**");

(f)    All Business records, the Business landline telephones and numbers, fax line, cellular telephone numbers registered to the Business;

(g)    All Business Intellectual Property, websites, domain names, social media accounts, and accompanying artwork and photographs as listed on Schedule 2.1(g);

(h)    Goodwill of the Business;

(i)    Subject to applicable laws and regulations, all Business permits and licenses (if transferable) (the "**Acquired Permits**");

(j)    All assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than, in each case, the Excluded Assets);

(k)    All Works in Progress, with revenue allocated as listed on Schedule 2.3;

(l)    All Customer Deposits for orders/work not commenced or completed (to be pro-rated as agreed amongst the Parties).

In furtherance of the foregoing, Seller hereby irrevocably constitutes and appoints Buyer (and all officers, employees or agents designated by Buyer), with full power of substitution, as Seller's true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Seller and in the name of Seller or in its own name to take any and all appropriate action and to execute and deliver any and all documents and instruments which may be necessary or desirable to demand, collect, endorse, pursue or otherwise deal with or use any of the Purchased Assets or otherwise carry out the purposes of this Agreement post-closing. If the transaction contemplated hereunder fails to close this provision is voided.

SECTION 2.2  Excluded Assets.  Notwithstanding Section 2.1, the term Purchased Assets shall not include the following,  (the "**Excluded Assets**"):

Exhibit 1

(a)      Cash on hand at the time of the Closing Date, which does not include Customer Deposits;

(b)      All bank accounts, deposit accounts, securities and cash equivalents of the Business prior to the Closing Date;

(c)      Investment accounts of the Business prior to the Closing Date;

(d)      Accounts payable of the Business prior to the Closing Date;

(e)      Accounts receivable earned prior to the Closing Date;

(f)      Insurance policies in place prior to the Closing Date;

(g)      The corporate seals, organizational documents, minute books, equity books, Tax returns relating to income Taxes, books of account, or other records relating to the organization of Seller;

(h)      All assets attributable to any Employee Benefit Plans;

(i)      All of Seller's permits, licenses, registrations and authorizations (other than the Acquired Permits);

(j)      All claims, causes of action, rights of recovery and rights of set off of any kind related to Excluded Assets or Excluded Liabilities; and

(k)

**SECTION 2.3**  Assumed Liabilities. Except as otherwise provided herein, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities or obligations of Seller except for Liabilities related to the Assumed Contracts and Works in Progress listed in Schedule 2.3.  Seller shall be responsible for all Liabilities of the Business accruing prior to the Closing and shall discharge such Liabilities as and when they become due. Buyer shall be responsible for all Liabilities of the Business accruing after the Closing and shall discharge such Liabilities as and when they become due. All Customer Deposits for Assumed Contracts and Works in Progress (as pro-rated) shall be assigned and transferred to Buyer at Closing and are deemed Purchased Assets, and Buyer agrees to complete finishing work (labor only) for up to sixty (60) Works-in-Progress jobs a week while the rent under the Sublease (as defined below) is $0.00. Parties agree that any returns received for sales completed prior to closing will be at the cost of the Seller. Within sixty (60) days of the Closing, Buyer shall calculate the total amount of returns made after Closing for sales completed prior to the Closing and Seller shall pay such amount to Buyer within two (2) business days of written notice of such amount, which written notice shall contain an itemized list of all such returns. Any returns received for sales completed after closing shall be at the cost of the Buyer.

Exhibit 1

**SECTION 2.4** <u>Excluded Liabilities.</u> Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities or obligations of Seller of any kind or nature whatsoever other than the Assumed Liabilities of Section 2.3. Except for the Assumed Liabilities of Section 2.3, or as otherwise set forth in this Agreement, Buyer shall not assume, pay, perform or discharge, and shall not be deemed to assume any Liabilities of Seller not related to the Business, including, but not limited to:

(a)     Any outstanding debt incurred by the Seller prior to the Closing Date;

(b)     Any Liabilities incurred by Seller in favor of any person or entity holding an equity interest in Seller, or Seller's affiliates and predecessors;

(c)     Any Liabilities of Seller for any Tax including: (i) any Tax payable by Seller with respect to the operation of the Seller's Business through the Closing Date; (ii) any Tax payable by Seller with respect to the ownership, possession, purchase, lease, sale, disposition or use of any assets of Seller at any time on or before the Closing Date; and (iii) any Tax payable by Seller resulting from the sale of the Purchased Assets to Buyer or otherwise resulting from the transactions contemplated by this Agreement, including grantor Taxes;

(d)     Any Liabilities of Seller that are incurred or arise before or after the Closing Date, or that relates to any pending litigation or judicial, administrative agency or arbitration proceeding or investigation (a "**Proceeding**") or other event that occurs or circumstances that existed before or exist after the Closing Date, but excluding any of the foregoing arising out of Buyer's use or operation of the Purchased Assets after the Closing Date;

(e)     Any Liabilities of Seller that were or are incurred in connection with the negotiation, execution or performance of this Agreement;

(f)     Any Liabilities of Seller, the incurrence or existence of which constitutes or will constitute a breach or failure of, or a default under, any representation, warranty, covenant or other provision of this Agreement;

(g)     Any Liabilities of Seller to any or all employees or former employees of Seller including Liabilities under Seller's employee benefit plans;

(h)     Any Liability of Seller that is not an Assumed Liability;

(i)     Encumbrance on or affecting Seller's assets including the Purchased Assets; and

(j)     Those items listed on <u>Schedule 2.4(j)</u>.

**SECTION 2.5** <u>Purchase Price; Deposit; Allocation of Purchase Price; Prorations.</u>

**2.5.1** <u>Purchase Price.</u> As consideration for the Purchased Assets, but subject to any credits and offsets provided in this Agreement, Buyer shall pay to Seller a total purchase price of $5,750,000.00 (the "**Purchase Price**").

7

Exhibit 1

**2.5.2**  Payment of Purchase Price.

(a)    Earnest Deposit. An earnest deposit in the sum of $50,000.00 (the "**Deposit**") paid by Buyer to Seller upon (i)time of full Agreement by all Parties and (ii) within two (2) business days of the termination of the due diligence Contingency Period or the Contingency Extension Period. The Deposit shall be delivered to and held in escrow by The Lehman Law Firm until the earlier of (i) the Closing, at which time the Deposit shall be released from escrow and delivered to Seller as part of the Purchase Price, or (ii) the termination of this Agreement pursuant to Section 2.7, at which time the Deposit shall be returned to Buyer in full;

(b)    Cash Closing Payment. At the Closing, Buyer shall pay to Seller $4,851,000.00 in immediately available funds, plus or minus prorations and other adjustments provided for herein (the "**Cash Closing Payment**"). On the Closing Date, the Parties shall use good faith efforts to calculate and determine any adjustments to the Purchase Price, which shall be limited to any Work In Progress proration adjustment as agreed amongst the Parties and any Inventory adjustment pursuant to Section 3.1.26. The Purchase Price shall be payable at the Closing via wire transfer of immediately available funds to an account specified by Seller by written notice to Buyer prior to Closing. Delivery of the Cash Closing Payment: (i) assumes no indebtedness for borrowed money or other long-term liabilities of the Seller at Closing which are not expressly assumed by Buyer and that the Purchased Assets are free and clear of all liens; and (ii) assumes that no Material Adverse Effect with respect to Seller's Business or operations or the Purchased Assets has occurred as of the date of closing; and

(c)    Promissory Notes. At the Closing, Buyer shall deliver to Seller a promissory note in the principal amount of $604,500, bearing interest at the rate of 4.0% per annum accruing from the date of the note and paid in ninety-six (96) consecutive monthly payments, the first of which being due on the 1st of the month of the twenty-fifth (25th) month anniversary of the note (the "**First Promissory Note**"); and (c) Buyer shall deliver to Seller a promissory note in the principal amount of $287,000.00, bearing interest at the rate of 4.0% per annum accruing from the date of the note and paid in one balloon payment being due on the one hundred twentieth (120th) anniversary of the note (the "**Second Promissory Note**," together with the First Promissory Note, (the "**Notes**"). There is no prepayment penalty on the Notes. The Buyer also agrees to execute a security agreement, and the Seller shall file UCC-1 against all assets of the business which shall be terminated upon full payment of the outstanding principal of each Note. The Seller shall have the right to assign the rights under the Note to themselves individually and or an entity controlled by the Sellers Parties and/or require payment to be made to David and Lee, individually.

With respect to the Deposit delivered to the Escrow Agent pursuant to this Section, Seller and Purchaser agree that the duties of the Escrow Agent hereunder are purely ministerial in nature and that the Escrow Agent shall incur no liability hereunder or otherwise (except for willful misconduct or gross negligence) for any action taken by it hereunder or for any failure or refusal to act pursuant to any advice, notice, direction or instruction which it may receive from Seller or Purchaser or for any other matter. The Escrow Agent shall have no responsibility to determine the authenticity or validity of any notices, directions, instructions or other items delivered to it, and it shall be fully protected in acting in accordance with any written notice, direction or instruction given to it under this Agreement and believed by it to be authentic. Except in the case of willful

Exhibit 1

misconduct and/or gross negligence of the Escrow Agent, Seller and Purchaser, jointly and severally, agree to indemnify and hold harmless the Escrow Agent from and against any liability, and shall promptly pay or reimburse costs incurred by it, in connection with its performance hereunder as Escrow Agent.

The Escrow Agent may, at any time, discharge its duties hereunder by depositing the Deposit with a Court of competent jurisdiction and in the event of a dispute hereunder, Escrow Agent shall so deposit the Deposit upon request of Seller or Purchaser.

Purchaser agrees that notwithstanding the fact that Seller's counsel is acting as the Escrow Agent hereunder, Seller's counsel shall at all times be permitted to continue to represent Seller in connection with this Agreement and the transaction contemplated hereby, and Purchaser consents to said representation.

**2.5.3** Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets as described on Schedule 2.5.3 (the "**Allocation of Purchase Price**"). Buyer and Seller shall agree to mutually determine an Allocation of the Purchase Price prior to Closing. The Parties warrant and represent that said allocations were a prime subject matter of their negotiations and they believe that these allocations truly reflect the economic value of the respective interests to be conveyed hereunder.  The Parties further warrant and represent that they shall not at any time, directly or indirectly, expressly or impliedly, take any action, with the taxing authorities or otherwise, inconsistent with the allocations outlined herein.

**2.5.4** Prorations.  Except as otherwise set forth in this Agreement, all utility charges, deposits, rents, security deposits, Taxes, or other payments associated with the Business shall be prorated as of the Closing Date.  All prorations shall be final.  The prorations and adjustments provided for in this Section shall be made so that Seller shall receive the income and be charged with the expense of the operation of the Business up to and including the Closing Date.  Buyer shall receive a credit for all prorations due from Seller as of Closing, and Buyer shall pay all such expenses following the Closing Date; Buyer shall be charged for all prorations due from Buyer as of Closing which have already been paid to third parties by Seller prior to the Closing Date.

**SECTION 2.6**    Exclusivity.  In consideration of Buyer's willingness to spend the substantial time and resources necessary to complete due diligence, and to finalize and execute this Agreement and ancillary transaction documents, Seller hereby grants to Buyer an exclusive period of time in which to conduct these activities, beginning as of July 10, 2025, and continuing through 90 days thereafter (the "**Exclusivity Period**").  During the Exclusivity Period, unless earlier terminated by Buyer, Seller (a) shall cause each of its members, managers, employees, advisors, affiliates, agents, and representatives (collectively the "**Representatives**") to immediately cease and terminate any solicitation, initiation, encouragement, activity, discussion, or negotiation with any person or entity with respect to any proposed, potential, or contemplated Alternative Transaction (as defined below), and (b) shall not, and shall ensure that none of the Representatives shall not, directly or indirectly, (i) solicit, initiate or encourage the submission of any indication of interest relating to an Alternative Transaction, (ii) participate in any discussion or negotiation regarding, or furnish to any person or entity any information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes, or may

Exhibit 1

reasonably be expected to lead to any Alternative Transaction, or (iii) authorize, approve, consummate, engage in, or enter into any agreement with respect to any Alternative Transaction. For purposes of this Agreement, "**Alternative Transaction**" means any (1) reorganization, dissolution, liquidation, refinancing, or recapitalization, (2) merger, consolidation, equity interest exchange, or acquisition, (3) sale or exchange of the Real Property (as defined below) or any material amount of assets other than in the Ordinary Course of Business, (4) direct or indirect purchase, sale, or other disposition of any equity interests, (5) similar transaction or business combination involving any equity interests or assets, or (6) other transaction, the consummation of which would prevent, impede or delay the consummation of the transactions contemplated in this Agreement. Seller shall immediately notify Buyer in writing of any solicitation of information, proposal, indication of interest, or other communication of which the Business or any Representative becomes aware during the Exclusivity Period relating to a possible Alternative Transaction. During the Exclusivity Period, the Business and Seller will conduct its business and operations in the Ordinary Course of Business in accordance with good business practices. Buyer and its representatives, agents, consultants, advisors, and lenders will be given access to the properties, personnel, and financial, legal, accounting, tax, and other information relating to the operations and properties of the Business all subject to the previously executed Non-Disclosure Agreement.

SECTION 2.7 Due Diligence Contingency. The term "**Contingency Period**" shall mean the period commencing on July 10, 2025, and ending at 11:59pm (Chicago Time) on the date that is fourteen (14) days from the date hereof or any agreed upon additional extension at which point Buyers' right to terminate under the Due Diligence contingency shall expire and this Agreement shall become binding. From the date hereof until Closing or earlier termination, Buyer, and its agents, employees and independent contractors ("**Buyer's Agents**"), shall have the right, at Buyer's sole cost and expense, to make an inspection of the Business, including, but not limited to, the books and records of the Business, financial statements, Tax returns, contracts, customer lists, site inspections, equipment inspections, and physical inspections. Buyer understands and agrees that any on-site inspections of the Business shall be conducted upon delivery at least twenty-four (24) hours' prior written notice to Seller. Notwithstanding anything else in this Agreement to the contrary, Buyer may terminate this Agreement for no reason or for any reason by delivery of written notice to Seller of such termination at any time after the date hereof and prior to the expiration of the Contingency Period , and such notice need not set forth any reason for the termination of the Agreement.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

SECTION 3.1 Representations and Warranties of Seller. To induce Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby represents and warrants to Buyer that:

**3.1.1** Organization; Capitalization. Seller is a limited liability company duly organized and validly existing under the laws of the State of New York. The Seller is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required under applicable law. Seller has full power and authority to own or

Exhibit 1

use the Purchased Assets, to carry on the Business and to execute and deliver this Agreement, and to consummate the transactions contemplated with respect to it hereby and thereby. Seller has made available to Buyer true, correct and complete copies of the organizational documents of the Seller, and Seller has not violated any provision of its organizational documents. Lee and David own 100% of the membership interests issued and outstanding of Seller free and clear of all Encumbrances.

**3.1.2** <u>Authorization and Enforceability</u>.  All corporate action on the part of Seller, and its managers and members, necessary for the authorization, execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, has been taken.  This Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.  Seller's execution, delivery and performance of this Agreement and the execution, delivery and performance of all other agreements and instruments by Seller in connection with this Agreement and the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller in accordance with applicable law.

**3.1.3** <u>Title to and Condition of Assets</u>.  (a) Seller has good, marketable and valid title to all of the Purchased Assets free and clear of all mortgages, liens, security interests, pledges, charges, claims, Encumbrances and restrictions of any nature whatsoever. (b) Seller has no knowledge of any conditions or events which would prevent continued normal operation or use of the Purchased Assets or would otherwise adversely affect the operation of the Business and/or use of the Purchased Assets as currently employed in the Business.  The Purchased Assets are free and clear of any liability to pay any rent, royalty or fee or other consideration of any kind to any patent owner, licensor or other third party, except as otherwise set forth in <u>Schedule 3.1.3</u> of the Disclosure Schedules.  Buyer reserves the right to inspect all assets with or without an independent expert during the Contingency Period. Each tangible asset included in the Purchased Assets and each tangible asset that is the subject of any leasehold interest or license that is included in the Purchased Assets to the best of Sellers' knowledge is free from material defects (patent and latent), has been maintained in accordance with customary industry practice, is in good repair and operating condition and is suitable for the purposes for which Seller is presently using such asset, in the ordinary course of business, normal wear and tear excepted. This representation in Section 3.1.3(b) shall survive closing for one (1) year. No such asset is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business. All of the tangible assets included in the Purchased Assets and all of the tangible assets that are the subject of any leasehold interest or license that is included in the Purchased Assets are in the possession of Seller and their possession will be transferred to Buyer in connection with the Closing, There are no excluded assets.

**3.1.4** <u>Taxes</u>.  Seller has duly filed all Tax reports and returns (including, without limitation, all federal, state and local income tax, franchise tax, gross receipts, sales tax, use tax, occupational tax, wage and payroll tax and real and personal property tax returns) required to be filed by Seller and Seller has duly paid all Taxes and other charges (including, without limitation, customs duties) due, or claimed to be due from Seller by, any federal, state, or local taxing authority.  Seller has withheld all Taxes required to be withheld by it by any federal, state, or local taxing authority.  There are no claims asserted for, or pending questions of a material nature

Exhibit 1

relating to, Taxes or assessments against Seller. No claim has ever been made by an authority in a jurisdiction where Seller does not file or has not filed Tax returns that Seller is or may be subject to taxation by that jurisdiction. There are no Encumbrances (other than Permitted Encumbrances) on any of the assets of Seller that arose in connection with any failure (or alleged failure) to pay any Tax. No federal, state, local, or non-U.S. tax audits or administrative or judicial tax proceedings are pending or being conducted with respect to Seller, or were pending or conducted any time, and no such proceeding is threatened. Seller has not received from any federal, state, local or non-U.S. taxing authority (including jurisdictions where Seller has not filed tax returns) any (i) notice indicating an intent to open an audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority against Seller. There are no Tax liens on the Purchased Assets, except for liens for Taxes which are not yet due and payable. Seller is not a foreign person as defined in Treasury Regulation Section 1.1445-2(b)(2)(i) and will not be subject to withholding under Section 1445 of the Code and the Treasury Regulations promulgated thereunder with respect to the sale of the Purchased Assets.

**3.1.5** <u>Litigation; Compliance</u>. Except as set forth in <u>Schedule 3.1.5</u> of the Disclosure Schedules, Seller represents that: (a) there are no claims, proceedings or investigations pending or threatened against Seller relating to any of the Purchased Assets or the Business; (b) Seller is not subject to any order, judgment, injunction or decree relating to any of the Purchased Assets or the Business; (c) no complaint has been filed, and there is no pending or threatened proceeding or investigation, involving an alleged violation of any Law relating to any of the Purchased Assets or the Business; (d) there is no basis for any such claim, proceeding, investigation, order, judgment, injunction, or decree; (e) the methods employed by Seller in the operation of the Business, and the use by Seller of the Purchased Assets, comply in all material respects with all Laws, regulations and ordinances; (f) no notices of any violations of any applicable Laws, regulations or ordinances relating to any of the Purchased Assets or the Business have been received by Seller; and (g) Seller has not received notice from any Governmental Body that any of the Purchased Assets or products sold by the Business is not in compliance with applicable Laws, regulations and ordinances.  Seller and the operation of the Business and the ownership and use of the Purchased Assets is, and has been at all times, in compliance, in all material respects, with all applicable Laws, regulations, and ordinances, and no proceeding has been filed or commenced against Seller, and Seller has not received any notice, alleging any failure to so comply.

**3.1.6** <u>Absence of Conflicts</u>.  Except as set forth on <u>Schedule 3.1.1</u> of the Disclosure Schedules, the execution and delivery by Seller of this Agreement and all other agreements and instruments to be executed and delivered by Seller in connection herewith, the consummation by Seller of the transactions provided for herein and contemplated hereby and thereby, and the fulfillment by Seller of the terms hereof, will not: (a) conflict with or result in a violation of breach of, or default under, any provision of the articles of organization, operating agreement, or other organizational documents of Seller; (b) conflict with or result in a violation of breach of any provision of any law, judgment, order, writ, injunction, decree, statute, rule or regulation of any court, administrative agency, bureau, board, commission, office, authority, department or other governmental entity applicable to Seller, the Business, or the Purchased Assets; (c) result in a default, give rise to any right of termination, cancellation or acceleration, or require any consent

Exhibit 1

or approval, under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, loan, factoring arrangement, license, credit agreement, lease or any other instrument or obligation to which Seller is a party; (d) result in the creation or imposition of any Encumbrance on the Purchase Assets; or (e) require any consent, approval, permit, governmental order, declaration of filing with, or notice to, any Governmental Body by or with respect to Seller.

**3.1.7** <u>Fees and Commissions</u>.  Seller has not engaged the services of a broker in connection with the sale and purchase contemplated by this Agreement.  Seller agrees to indemnify, defend, and hold harmless Buyer from liability for any compensation to any finder, broker, agent, attorney, or financial advisor retained by Seller, its managers or members, or Lee or David, or claiming a right to compensation through any Seller Party or Seller's managers, in connection with the transaction contemplated by this Agreement.

**3.1.8** <u>Financial Statements</u>.  Seller has delivered to Buyer the following financial statements to Buyer and they are attached as <u>Schedule 3.1.8</u> of the Disclosure Schedules hereto: [P&L, Tax returns, vendor invoices, terms, discounts etc.] (the "**Financial Statements**").  All such Financial Statements are true and correct in all material respects, present fairly the operations of the Business as of the date thereof and for the periods represented thereby, and have been prepared in a consistent manner. The Financial Statements (i) have been prepared consistent with the historical financial accounting methods, practices, principles, methodologies and policies of the applicable Seller applied on a consistent basis throughout the respective periods involved and in accordance with GAAP, (ii) are true and correct in all material respects, (iii) fairly present the financial condition of the Seller as of such dates and the results of operations and cash flows of Seller for such periods, and (iv) were derived from and are consistent with the books and records of such Seller, which books and records are consistent with the historical financial accounting methods, practices, principles, methodologies and policies of such Seller, applied on a consistent basis throughout the respective periods involved.  Since June 30, 2025, (x) there has been no Material Adverse Effect and (y) the Business has been operated in the Ordinary Course of Business. Without limiting the generality of the immediately preceding sentence, since June 30, 2025, Seller has not:

(a)     made any capital investment in, any loan to, or any acquisition of the securities or assets of, any other Person;

(b)     issued any note, bond, or other debt security or created, incurred, assumed or guaranteed any Indebtedness;

(c)     imposed or permitted to be imposed any Encumbrance, other than Permitted Encumbrances, upon any of its assets, tangible or intangible;

(d)     sold, assigned, licensed, leased, permitted to lapse, transferred or otherwise disposed of any of its tangible assets, Intellectual Property or other intangible assets, except for sales of Inventory in the Ordinary Course of Business;

(e)     made any capital expenditure involving more than $25,000.00 or otherwise outside the Ordinary Course of Business, or delayed or failed to make

Exhibit 1

any capital expenditure that would otherwise have been made in the Ordinary Course of Business, other than the purchase of LEXCE Trend-8 High Curve Edger;

(f) terminated, repudiated, assigned or waived any Contract (or any contract that, if in effect as of the date hereof and not assigned, would be a Contract), or received notice of any such actions from the counterparty thereto;

(g) suffered any theft, damage, destruction or casualty loss to its property, whether or not covered by insurance;

(h) initiated, compromised or settled any proceeding;

(i) entered into a transaction with any shareholder or any affiliate of any Seller or any member, including the making of any payment (including any dividends or other distributions with respect to Seller's equity interests) to any such Person or the forgiveness of any Indebtedness due or owing from any such Person to any Seller;

(j) made any change in its accounting methods, principles or practices for financial accounting or for IRS reporting purposes, collected receivables, paid payables, purchased inventory, billed customers, or accrued for receivables and payables other than in the Ordinary Course of Business, or otherwise engaged in any activity that would reasonably be expected to (or is otherwise intended to) (1) accelerate to the period prior to the Closing the collection of accounts or notes receivable that otherwise would be expected to occur after the Closing or (2) postpone to any period after the Closing the payment of accounts payable or other Liabilities that otherwise would be expected to occur prior to the Closing; or

(k) committed or agreed to do any of the foregoing.

**3.1.9** <u>Undisclosed Liabilities.</u> Seller has no Liability (and there is no basis for any present or future proceeding against it giving rise to any Liability), except for (a) Liabilities set forth on the face of the most recent Financial Statements, (b) Liabilities that have arisen after the date of the most recent Financial Statements in the Ordinary Course of Business, none of which results from, arises out of or is related to any breach of contract, breach of warranty, tort, infringement or violation of Law and none of which (i) exceeds $25,000.00 or (ii) would reasonably be expected to give rise to a Material Adverse Effect, and (c) Liabilities for performance in the Ordinary Course of Business under Contracts set forth on <u>Schedule 3.1.14</u> of the Disclosure Schedules (none of which results from, arises out of or is related to any breach of contract, breach of warranty, non-contingent indemnification or similar obligation), and (d) the Liabilities set forth on <u>Schedule 2.3</u> and <u>Schedule 2.4</u> of the Disclosure Schedules.

**3.1.10** <u>Franchise Agreement</u>.  There is no franchise, license or similar agreement in affect governing the Business or the use of its name, and no approval from any franchisor or licensor is necessary for the consummation of the transactions contemplated by this Agreement or the continued operation of the Business after the Closing.

14

Exhibit 1

**3.1.11** <u>Name</u>.   There are no actions, suits or proceedings pending, or, to the Knowledge of any Seller Party, threatened against Seller that may result in the impairment of the right of (i) Seller to use the name "Cool Frames" or "CoolFrames"; or (ii) Buyer to use the name "Cool Frames" or "CoolFrames" after the Closing.   The use of the name "Cool Frames" and "CoolFrames" in the Business does not infringe upon the rights of any third party.

**3.1.12** <u>Customers</u>. As part of the sale, included as part of the Assets is the Sellers' customer database.

**3.1.13** [Purposefully Omitted].

**3.1.14** <u>Material Contracts; No Defaults</u>.   Schedule 3.1.14 of the Disclosure Schedules contains a complete and accurate list, and Seller has delivered to Buyer true and complete copies (if in writing, otherwise, a written description of the terms thereof), of all Contracts.  Each Contract identified in <u>Schedule 3.1.14</u> is in full force and effect and is valid and enforceable in accordance with its terms.   There are no agreements, arrangements or understandings between Seller and any party to a Contract relating to doing business in the future, including offering discounts or accepting returns.  Except as set forth in <u>Schedule 3.1.14</u>, no event has occurred or circumstance exist that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give Seller or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify any Contract identified in <u>Schedule 3.1.14</u>.  Except as set forth in <u>Schedule 3.1.14</u>, no customer of Seller is entitled to or customarily receives discounts, allowances, profit margin guarantees, volume rebates or similar reductions in price or trade terms.   The Contracts are (i) legal, valid and binding, enforceable in accordance with their respective terms (subject to any applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally), and are in full force and effect, (ii) assuming Buyer's compliance with the terms of the Contracts following Closing (to the extent such Contracts are Purchased Assets), the Contracts will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the transactions contemplated by this Agreement, (iii) the Seller has timely performed all material obligations required to be performed by Seller to date under the Contracts, (iv) Seller and no other Seller Party is in default under any material obligation of any such Contracts and, to the Knowledge of any Seller Party, no event has occurred that, with notice or lapse of time or both, would constitute a breach or default, or permit termination, modification, or acceleration, under any such Contracts, (v) no warranty claims or other claims have been asserted under any of the Contracts, and (vi) Seller and no other Seller Party has repudiated any material provision of any of the Contracts. Except for this Agreement, there is no Contract, arrangement or decree binding upon Seller, its Business, assets, or, to the Knowledge of any Seller Party, any employee, that has or would reasonably be expected to have the effect of prohibiting the conduct of all or a portion of the Business as currently conducted or would reasonably be expected to result in a Material Adverse Effect.

**3.1.15** <u>Employees</u>. <u>Schedule 3.1.15</u> of the Disclosure Schedules contains a correct and complete list of all Employees of Seller, including citizenship, salary or hourly wage, position,

Exhibit 1

hire date, all accrued and unused paid time off ("**PTO**"), and any benefits, including but not limited to retirement, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, change in control, retention, severance, welfare, fringe-benefit or other similar agreement benefit, plan, policy, program, or arrangement. Except as set forth in Schedule 3.1.15, Seller is in full compliance with all legal requirements relating to employment practices. Except as set forth on Schedule 3.1.15, neither the execution, delivery nor performance of this Agreement or any other document related hereto nor the consummation of the transactions contemplated hereby or thereby will: (i) result in any payment becoming due from the Seller or, to Seller's, Lee's, or David's Knowledge, any other person to any employee or contractor; (ii) increase any benefits otherwise payable under any contract or arrangement between the Seller, on one hand, and any employee or contractor, on the other hand; or (iii) result in the acceleration of the time of payment or vesting of any benefits under any such contract or arrangement. Any obligation of the Seller as of the Closing Date for wages, salary, commissions, other employee compensation, holiday pay, premiums for workers' compensation, employment or unemployment insurance, employer health tax, pension plan premiums, amounts owing under or in respect of benefit plan payments and all other payroll obligations or expenses in respect of employees or contractors, as applicable, has been paid or will be paid by Seller prior to Closing. The employment of all Employees and engagement of all independent contractors of Seller is terminable by Seller at will, without prior notice, and no Employee or independent contractor is entitled to severance pay or other benefits following termination or resignation, except as otherwise provided by applicable Law. To the best of Sellers' knowledge no Employee or independent contractor of Seller: (i) intends to terminate his or her relationship with Seller; (ii) has received an offer to join a business that may be competitive with the Business; or (iii) is bound by any confidentiality agreement, noncompetition agreement or other contract that may have an adverse effect on the performance by such Employee or independent contractor of any of his or her duties or responsibilities to Seller. Each individual who has provided services to Seller as an independent contractor at any time has, at all times, been properly classified by Seller as an independent contractor. Each individual who has provided services to Seller as an "exempt" employee under the Fair Labor Standards Act or analogous state Laws at any time has, at all times, been properly classified by Seller as an exempt employee. Seller has on file a complete and valid Form I-9 for all current and former Employees to the extent required by law.

**3.1.16** No Material Adverse Changes and Operation in Ordinary Course. Except as set forth in Schedule 3.1.16 of the Disclosure Schedules, since June 30, 2025, Seller has not: (a) incurred or become subject to, or agreed to incur or become subject to, any obligation or Liability, absolute or contingent, relating to any of the Purchased Assets or the Business, except current liabilities incurred, and obligations under contracts entered into, in the Ordinary Course of Business, the performance of which will not, individually or in the aggregate, have a Material Adverse Effect on the financial condition or results of operations of the Business; or (b) mortgaged, pledged or subjected to, or agreed or permitted to be subjected to, any lien, charge or other Encumbrance, any of the Purchased Assets. Since such date there has not been any change, event or condition which, in any case or in the aggregate, has had or may have a Materially Adverse Effect on the Purchased Assets or the operations or prospects of the Business, including, without limitation, any Material Adverse Change in the revenues or costs and expenses of the Business or in Seller's relationships with employees, agents, vendors or customers.

Exhibit 1

**3.1.17** <u>Full Disclosure; Absence of Untrue Statements</u>.   No representation of warranty by any Seller Party in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate, document, or other statement furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**3.1.18** <u>Capitalization.</u> <u>Schedule 3.1.18</u> of the Disclosure Schedules sets forth the true and accurate ownership of the issued and outstanding interests in Seller. All issued and outstanding interests in Seller have been duly authorized, validly issued, and are fully paid and non-assessable. Lee and David are the only holders of any interest in Seller, and each has the respective sole right, title, and interest in Seller and its profits, earnings, gains, or losses. There are no outstanding options, warrants, or other rights to purchase, sell, or otherwise dispose of, or rights to exchange or convert into, any securities of or interests in Seller. There is no contractual obligation, or provision in Seller's organizational documents which obligates Seller to purchase, redeem, or otherwise acquire, or make any payment (including any dividend or distribution) in respect of, any securities of or interests in Seller's assets.

**3.1.19** <u>Non-contravention.</u> The execution, delivery and performance of this Agreement and each of the additional agreements and instruments to be executed by any Seller Party in connection with this Agreement and the consummation of the transactions contemplated hereby and thereby to the best of Sellers' knowledge will not: (a) violate any Law, decree or other restriction of any Governmental Body to which Seller or any of the Purchased Assets is subject or any provision of the organizational documents of Seller; (b) conflict with, result in a breach of, constitute a default under, result in the acceleration, suspension, loss or impairment of any right or obligation under, create in any Person a cause of action, the right to accelerate, terminate, modify or cancel, or require any modification, transfer, termination, notice, consent, authorization or filing under any Assumed Contract, permit, instrument, law or other arrangement to which any Seller Party is a party or by which it is bound or to which it or any of the Purchased Assets is subject (or result in the imposition of any Encumbrance upon any of the Purchased Assets); or (c) result in any payment or benefit, or entitlement thereto, to any current or former director, officer, Employee or service provider of Seller or the Business, or increase the amount or value or accelerate the time, vesting or funding, thereof, or require any contributions or payments to fund any obligations under any Employee Benefit Plan.

**3.1.20** <u>Intellectual Property.</u> <u>Schedule 3.1.20</u> of the Disclosure Schedules contains a complete and accurate list and description of all registered Intellectual Property and Seller Intellectual Property registered or filed in the name of, or otherwise owned by, Seller or used in the operation of the Business. Seller is the sole and exclusive legal and beneficial owner or licensee of all right, title, and interest in and to the Intellectual Property Assets and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of all Encumbrances. The Intellectual Property Assets are all of the Intellectual Property necessary to operate the Business a presently conducted. Seller's rights in the Intellectual Property Assets are valid, subsisting, and enforceable. To the Knowledge of any Seller Party, the conduct of the Business as currently and formerly conducted, and the Intellectual Property Assets as currently or formerly owned, licensed, or used by Seller,

Exhibit 1

have not infringed, misappropriated, diluted, or otherwise violated, and have not, do not, and will not infringe, dilute, misappropriate, or otherwise violate, the Intellectual Property or other rights of any Person. To the Knowledge of any Seller Party, no Person has infringed, misappropriated, diluted, or otherwise violated, or is currently infringing, misappropriating, diluted, or otherwise violating, any Intellectual Property Assets. All necessary registration, maintenance and renewal fees currently due in connection with any such registered Intellectual Property have been made, and all necessary documents, recordations and certifications in connection with such registered Intellectual Property have been filed with the relevant patent, copyright, trademark or other applicable Governmental Body for the purpose of maintaining the registered status of such registered Intellectual Property. The registered Intellectual Property listed or required to be listed on Schedule 3.1.20 is subsisting, in full force and effect and valid and enforceable.

**3.1.21**   Social Media.   Schedule 3.1.21 of the Disclosure Schedules contains a complete and accurate list of all social media accounts that are used by Seller in the conduct of the Business or otherwise related to the Purchased Assets. Seller has complied in all material respects with all terms of use, terms of service and other Contracts and all associated policies and guidelines relating to its use of any social media platforms, sites or services in the conduct of the Business or otherwise related to the Purchased Assets.

**3.1.22**   Real Property. Seller does not own any real property. Schedule 3.1.22 of the Disclosure Schedules sets forth complete and accurate legal descriptions of all real property leased by Seller (collectively, the "**Real Property**"). Seller has delivered to Buyer (or otherwise made available) a true, correct, and complete copy of the lease for the Real Property (the "**Real Estate Lease**"), which continues in full force and effect and has not been amended, supplemented, revoked, repealed, or otherwise modified. There are no presently effective guaranties creating any obligations or liabilities on behalf of Seller or any other Person with respect to the Real Estate Lease.

**3.1.23**   Insurance. Schedule 3.1.23 of the Disclosure Schedules sets forth (a) a true and complete list of all current policies or binders of insurance currently maintained by Seller relating to the Business, the Purchased Assets, or the Assumed Liabilities (collectively, the "**Insurance Policies**"); and (b) with respect to the Business, the Real Property, the Purchased Assets, and the Assumed Liabilities, a list of all pending claims and the claims history for Seller for the last three (3) years. There are no claims related to the Business, the Purchased Assets, or the Assumed Liabilities pending under any of the Insurance Policies as to which coverage has been questioned, denied, or disputed or in respect of which there is an outstanding reservation of rights. Seller has not received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if not yet due, accrued. All of the Insurance Policies are in full force and effect and enforceable in accordance with their terms and have not been subject to any lapse in coverage.

**3.1.24**   Suppliers. Schedule 3.1.24 of the Disclosure Schedules sets forth with respect to the Business: (a) each supplier to whom Seller paid in excess of $7500.00 for the fiscal years ended in December 31, 2023, and December 31, 2024 (each a "**Material Supplier**," and collectively, the "**Material Suppliers**"); and (b) the amount of purchased from each Material

Exhibit 1

Supplier during such periods. Seller has not received any notice, and does not have any Knowledge, that any of the Material Suppliers has (i) ceased, or intends to cease, to supply goods or services to the Business, (ii) materially reduced, or intends to materially reduce, its supply of goods or services to the Business, or (iii) terminated or materially adversely altered, or intends to terminate or materially adversely alter, its relationship with the Business.

**3.1.25** Data Protection. The operation of the Business has been in compliance with all applicable Laws relating to the collection, use, storage, disclosure, transfer, import, export and processing of personal information and other confidential or sensitive information, all additional industry standards or requirements applicable to the conduct of the Business in the Ordinary Course of Business (including the Payment Card Industry Data Security Standard, if applicable), applicable provisions of Contracts to which Seller is a party, and all of Seller's internal or customer-facing policies. Seller has not been subject to any investigation or audit or been required to give notice to any Person with respect to non-compliance with laws relating to the collection, use, storage, disclosure, transfer, import, export or processing of personal information or other confidential or sensitive information. There has not been any incident in which personal information or other confidential or sensitive information held by or on behalf of Seller or in connection with the Business was or may have been stolen or improperly accessed, including any breach of security, and Seller has not received any written notices or complaints from any Person with respect thereto. Neither this Agreement nor the transactions contemplated by this Agreement will violate any privacy policy of Seller as it currently exists or as they existed at any time during which any of the personal information was collected or obtained by Seller. Seller has used commercially reasonable efforts to maintain the confidentiality of all personal information, including requiring all Persons having access thereto to execute written non-disclosure agreements requiring such Persons to maintain the confidentiality thereof. To the Knowledge of any Seller Party, no such Person is in violation of such agreement. Seller has established and implemented policies, programs and procedures that are commercially reasonable to protect the confidentiality, integrity and security of personal information in its possession, custody or control against unauthorized access, use, modification, disclosure or other misuse.

**3.1.26** Inventory. At Closing Seller will have and sell to Buyer, as part of and included in the Purchased Assets, the following which, in the aggregate and as of Closing, shall be valued at $250,000 (determined based on market value price after any discounts applied): (i) frame inventory; (ii) lens inventory; (iii) cleaning kits, (iv) custom boxes; (v) cases; and (vi) cleaning cloths. Such $250,000 inventory valuation shall be made up of at least $225,000 in frames. All frames and lenses must be in new, unused condition, a current product purchased by Seller within the last six (6) months of the date hereof, and best-selling items of Seller.

**SECTION 3.2** Representations and Warranties of Buyer. To induce Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller that:

**3.2.1** Corporate Organization and Power of Buyer. Buyer is a limited liability company and at the time of Closing will be duly organized, validly existing and in good standing under the laws of the State of Wisconsin. Buyer will file for a foreign entity to be permitted to do

19

Exhibit 1

business in New York and will have the corporate power to carry on its business and to consummate the transactions contemplated hereby.

**3.2.2** <u>Authorization and Enforceability</u>.  Buyer has full power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated herein. All corporate action on the part of Buyer, its managers, and members, necessary for the authorization, execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, has been taken.  This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**3.2.3** <u>Absence of Conflicts</u>.  The execution and delivery by Buyer of this Agreement and all other agreements and instruments to be executed and delivered by Buyer in connection herewith, the consummation by Buyer of the transactions provided for herein and the fulfillment by Buyer of the terms hereof, will not (a) conflict with or result in a breach of any provision of the articles of organization of Buyer, (b) result in a default, give rise to any right of termination, cancellation or acceleration, or require any consent or approval, under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, loan, factoring arrangement, license, credit agreement, lease or any other instrument or obligation to which Buyer is a party, or (c) violate or result in default under the organizational documents of Buyer, or any law, judgment, order, writ, injunction, decree, statute, rule or regulation of any court, administrative agency, bureau, board, commission, office, authority, department or other governmental entity applicable to Buyer, the violation of which would materially adversely affect Buyer. No consent is required to be obtained by Buyer in connection with the execution and delivery of this Agreement by Buyer or the consummation of the transactions contemplated herein.

**3.2.4** <u>Fees and Commissions</u>.  Buyer has not engaged a broker in connection with the transaction contemplated by this Agreement, Buyer agrees to indemnify, defend and hold harmless Seller from liability for any compensation to any finder, broker, agent, attorney or financial advisor retained by Buyer or managers or members, or claiming a right to compensation through Buyer or the managers or members, in connection with the transaction contemplated by this Agreement.

**ARTICLE IV**
<u>CONDITIONS TO THE CLOSING</u>

**SECTION 4.1**  <u>Conditions to Obligations of Each Party</u>.  The obligation of Seller and Buyer to consummate the Closing shall be subject to all consents, approvals, authorizations and orders of federal, state, local and foreign governmental and regulatory authorities necessary to consummate the transactions contemplated by this Agreement shall have been obtained.

**SECTION 4.2**  <u>Conditions to Obligations of Buyer</u>.  The obligation of Buyer to consummate the Closing is subject to the fulfillment on or before the Closing of each of the following conditions (any of which may be waived by Buyer):

20

Exhibit 1

**4.2.1**   Representations and Warranties; Performance.  (a) The representations and warranties set forth in this Agreement made by Seller shall be true and correct in all material respects as of the Closing as if made on the date of the Closing; and (b) Seller shall have performed all obligations and complied with all covenants and agreements required to be performed or to be complied with by it under this Agreement on or prior to the Closing.

**4.2.2**   Sublease. At Closing, Buyer and Seller shall enter into a sublease for the Real Property, terminable by Buyer at any time on sixty (60) days advance written notice and with the first six (6) months gross rent at $0.00 rent and $1,800 gross rent per month thereafter.  Buyer shall pay all utilities during the occupancy of the Lease. The Sellers' present Lease requires Landlord consent to any assignment and/or sub-lease. Buyer acknowledges that the Seller has not and will not obtain consent from the Landlord for the aforementioned sublease and accepts that should the Landlord require the Buyer to vacate the premises, the Buyer will comply therewith, and the Seller shall have no liability to the Buyer for any costs associated with their vacatur.

**4.2.3**   Elimination of Liens.  As of the Closing, the Purchased Assets shall be free and clear of all mortgages, liens, security interests, pledges, charges, claims, encumbrances and restrictions of any nature whatsoever and will be assigned and assumed by Buyer.

**4.2.4**   Financing.  Prior to Closing, Buyer shall have received suitable financing for the transaction contemplated hereunder in the amount $4,749,600. Said financing must be pursued expeditiously and in good faith. Any termination under this contingency must be accompanied by a written declination letter from said lender or any other documentation sup[porting the denial.

**4.2.5**   Undisclosed Liabilities; No Material Adverse Change. Seller does not have any Liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand or judgment against any of them giving rise to any Liability), except for: (i) the Liabilities set forth on the face of the June 30, 2025, financial statements; and (ii) Liabilities that have arisen in the Ordinary Course of Business after the dates set forth in the Financial Statements (none of which was caused by, arises out of, relates to, or is in the nature of, a breach of contract, breach of warranty, tort, infringement, or violation of law), which do not exceed in the aggregate $10,000. No event has occurred prior to Closing that may result in a Material Adverse Effect with respect to Seller after Closing.

**4.2.6.**   Condition of Assets. Purchased Assets shall be free and clear of all mortgages, liens, security interests, pledges, charges, claims, Encumbrances and restrictions of any nature whatsoever and will be assigned and assumed by Buyer.

**4.2.7**   Consulting Agreement. Lee and David shall each enter into a training and consulting agreement with Buyer to commence as of the Closing Date in a form acceptable to the Buyer (the "**Consulting Agreement**") that will provide, among other things, that David and Lee provide, at no charge, (a) a minimum of thirty (30) hours a week (between the two of them)  of consulting services to buyer for the period of time beginning on the closing date and ending ninety (90) days thereafter, (b) a minimum of ten (10) hours a week for the period of time beginning ninety-one days after closing and ending one hundred and eighty (180) days after the closing date, and (c) to provide consulting services via phone and email for the period of time beginning one

Exhibit 1

hundred and eighty-one (181) days after closing and ending twelve (12) months from the closing date.

**4.2.8**   Additional Deliveries.   At the Closing, Seller will deliver (or cause to be delivered):

(a)   an Assignment and Bill of Sale, in the form of Exhibit A, conveying the Purchased Assets to Buyer, executed by Seller;

(b)   a sublease for the Real Property, duly executed by Seller (the "**Sublease**"), in the form of Exhibit B attached hereto;

(c)   the Consulting Agreement, duly executed by Lee and David;

(d)   an assignment of the registered trademark "COOLFRAMES.COM" (U.S. Serial Number 88379614), duly executed by Seller;

(e)   a Closing Statement duly executed by Seller;

(f)   payoff letters and lien discharge documents, which payoff letters and lien discharge documents shall reflect the amounts required in order to pay in and provide that, upon payment in full of the amounts indicated, all Encumbrances of such creditor against, in and to the properties and assets of the applicable Seller shall be terminated and be of no further force and effect, and that such creditor shall forthwith execute and deliver to Buyer all terminations and releases as reasonably requested (including UCC-3 termination statements) necessary to evidence the foregoing termination;

(g)   a certificate of the manager or members of Seller certifying (i) the resolutions duly adopted by Seller, manager or other similar governing body, entity or person of the Seller, authorizing and approving the execution, delivery and performance of this Agreement and the transactions contemplated hereby, (ii) that such resolutions have not been rescinded or modified and remain in full force and effect as of the Closing, and (iii) to the incumbency and signatures of the managers of Seller executing this Agreement and any other document executed on behalf of the Seller in connection with the transactions contemplated hereby;

(h)   an affidavit executed by the Seller as required by Treasury Regulation Section 1.1445-2(b)(2), certifying that such Seller is not a Foreign Person (as the term is defined in the Code and the Treasury Regulations promulgated in connection therewith); and

(i)   such other proper assignments and instruments of conveyance sufficient to convey to Buyer title to the Purchased Assets, as the Parties may deem reasonably necessary or desirable to effect or evidence the transfers contemplated by this Agreement.

Exhibit 1

**4.2.9**  Delivery of the Purchased Assets.  At the Closing, Seller shall deliver or cause to be delivered legal and actual possession of the Purchased Assets in its possession free and clear of all mortgages, liens, security interests, pledges, charges, claims, Encumbrances and restrictions, to Buyer, together with any keys and other rights of access to the Purchased Assets.

**4.2.10**  Trademark/Tradename Registrations.  All documentation and assignment instruments necessary to transfer any and all trademark and/or tradename registrations held by the Seller and used in the Business, from Seller, as the case may be, to Buyer shall be delivered by Seller to Buyer at the Closing.

**4.2.11**  Licenses for Business.  Buyer shall have received: (i) all necessary and applicable permits or licenses to operate the Business, if any.  The Parties agree and acknowledge that should Buyer fail to obtain such permits, licenses and approvals on or before the Closing, this Agreement may be terminated by Buyer.

**4.2.12**  Employment.  On or prior to the Closing Date, Buyer may, but is not obligated, make an offer of employment to Employees of the Business for employment on an at-will basis with Buyer to commence on or after the Closing Date, subject to Buyer's customary pre-hiring practices and conditions and on such terms and conditions as Buyer may elect in its sole discretion. On and effective as of the Closing Date, Seller shall terminate the employment of each such Employee who accepts such offer of employment.  Employees who accept offers of employment pursuant to this Section 4.2.12 and commence employment with Buyer pursuant to such offers are referred to herein as the "**Transferred Employees**." Notwithstanding anything to the contrary herein, Buyer shall be under any obligation to continue the employment of any Transferred Employee for any period of time. All provisions contained in this Section 4.2.12 are included for the sole benefit of Seller and Buyer, and nothing in this Agreement, whether express or implied, shall create any third-party beneficiary or other rights (i) in any other Person, including any Transferred Employee or other current or former Employee of Seller, or (ii) to continued employment with Buyer. No provision of this Section 4.2.12 shall constitute an amendment to any employee benefit or compensation plan, policy agreement or arrangement of Buyer or obligate Buyer to provide any compensation or benefits to any Transferred Employee for any period of time or in any way limit Buyer's ability to change the compensation or benefits it offers to its employees.

**SECTION 4.3**  Conditions Precedent to Obligations of Seller.  The obligation of the Seller to consummate the Closing is subject to the fulfillment on or before the Closing of each of the following conditions (any of which may be waived by Seller):

**4.3.1**  Representations and Warranties; Performance.  (a) The representations and warranties set forth in this Agreement made by Buyer shall be true and correct as of the Closing as if made on the date of the Closing; and (b) Buyer shall have performed all obligations and complied with all covenants and agreements required to be performed or to be complied with by it under this Agreement on or prior to the Closing.

Exhibit 1

**4.3.2**  Additional Deliveries.  At the Closing, Buyer will deliver (or cause to be delivered):

(a)      the Cash Closing Payment to be paid to Seller at Closing;

(b)      the Notes;

(c)      the Consulting Agreement, executed by Buyer; and

(d)      a Bulk Sales Release Letter from the Tax Department of New York ("**Bulk Sales Release Letter**") reflecting that Seller has paid all federal, state and local taxes and assessments (including, without limitation, income, excise, unemployment, social security, occupation, retailers occupation, franchise, property and import taxes, duties and charges and all penalties and interest in respect thereto), and other Taxes required by Seller to have been paid to date.  If either of the above agencies issues a stop letter, then the required amount shall be held from the Seller's proceeds in escrow for the benefit of the Parties by the Seller's attorney until a release is obtained;

(e)      results of full uniform commercial code (both state and local filings), judgment, pending suit (both state and federal), bankruptcy and state and federal Tax lien searches on the Seller conducted by a recognized search firm, which searches reveal no adverse encumbrances or other unacceptable items with respect to any Seller and/or any of the assets to be transferred hereby; and

(f)      all login identification, account IDs, user names, handles, passwords and other related information associated with the social media accounts used by the Seller in the conduct of the Business.

**ARTICLE V**
POST-CLOSING COVENANTS

**SECTION 5.1**  Further Assurances.  If at any time after the Closing any further action is necessary or reasonably desirable to carry out the purposes of this Agreement or the transaction contemplated herein, then promptly upon the request of the other Party, Seller or Buyer, as the case may be, shall take such action.

**SECTION 5.2**  Segregation of Excluded Assets.  In the event Buyer shall come into possession of any Excluded Assets, Buyer shall promptly thereafter deliver such Excluded Assets to Seller in the same form received by Buyer and shall not commingle any such Excluded Assets with assets of Buyer.

**SECTION 5.3** Restrictive Covenants.

**5.3.1** The Seller Parties hereby agree that each will not, nor cause any of their respective agents, employees, or other representatives to, either alone or in conjunction with any other Person, directly or indirectly:

Exhibit 1

(a)      for a five (5) year period immediately following the Closing Date, own, manage, control, operate, consult with, render services for, provide financing to, or join, control or participate in the ownership, management, operation or control of, or the provision of financing to, any business within the World (whether in corporate, proprietorship or partnership form or otherwise), if such business participates in the selling or supplying services in any manner competitive with the Business  (collectively, the "**Protected Business**"). Buyer acknowledges that Seller presently owns and operates a physical store located at 3849 Route 9, Old Bridge, New Jersey (the "**New Jersey Store**"), which is competitive with the Protected Business in that it sells and markets eyeglasses, eyewear and related products.. The Parties agree that Lee and David may continue to own and operate the New Jersey Store and such ownership and operation shall be exempt from this restrictive covenant;

(b)      for the five (5) year period immediately following the Closing Date, engage, employ, solicit or contact with a view to the engagement or employment of (i) any employee of, or contractor to, of Buyer from time to time, or (ii) any Person who has been, at any time during the two (2) year period preceding such engagement, employment, solicitation or contact, an employee of, or contractor to the Buyer;

(c)      for the five (5) year period immediately following the Closing Date, cause, induce or encourage, or attempt to cause, induce or encourage, any current, former or prospective employee, customer, vendor, supplier, or other business relation of Buyer to terminate, or modify its manner or terms of or prospects for, doing business with any Protected Business;

(d)      for the five (5) year period immediately following the Closing materially interfere with the relationship between the Buyer and any Person described in clause (ii)(A), (ii)(B) or (iii) above; or

(e)      make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning, or otherwise say anything which is harmful to the reputation of, the Buyer or any of its employees or contractors.

**5.3.2** In the event of any breach or violation by any Seller of any of the covenants in this Section 5.3, the time period of such covenant with respect to Seller will be tolled and will not run until such breach or violation is resolved.

**5.3.3** Seller acknowledges and agrees that (i) during the course of Seller's ownership and involvement in the Business, Seller has developed relationships with the Seller's employees, vendors, suppliers, customers, and other business relations, which relationships constitute goodwill of the Seller, (ii) Seller has developed trade secrets and other confidential information, (iii) Buyer has a protectable interest in the Seller's goodwill, in the Seller's confidential information and in preventing unfair competition from former shareholders, officers, directors, employees and agents,  and (iv) the restrictions contained in this Section 5.3 are

Exhibit 1

reasonable and necessary to protect the legitimate business interests of the Buyer from time to time, including the Business' respective trade secrets, confidential information, reputation, goodwill and substantial relationships with specific prospective or existing customers, and constitute a material inducement to Buyer to enter into this Agreement and the other transaction documents and to consummate the transactions contemplated hereby and thereby.

**5.3.4**  It is understood by the Parties that any actions or inactions that are taken by the Seller, its members and managers, and respective affiliates that are exercised for the benefit of Buyer or its respective affiliates as an employee of the Buyer, agent of the Buyer, representative of the Buyer or any other capacity on behalf of the Buyer shall not be considered a breach of this Section 5.3, including any post-closing transition services provided pursuant to the Consulting Agreement.

**5.3.5**  Seller agrees and acknowledges that (i) the provisions of this Section 5.3 do not impose a greater restraint than is necessary to protect the goodwill, Confidential Information and other business interests of the Buyer, (ii) such provisions contain reasonable limitations as to time, geographical area and scope of activity to be restrained, (iii) such provisions are essential to the Agreement, and without such provisions Buyer would not have entered into the Agreement, and (iv) the consideration provided under this Agreement, including any amounts or benefits provided under Article II of this Agreement, is sufficient to compensate Seller for the restrictions contained in this Section 5.3. Seller agrees that Seller will not assert that, and it should not be considered that, any provision of this Section 5.3 is otherwise void, voidable or unenforceable or should be voided or held unenforceable. It is the intention of the Parties that, if any court, arbitrator or tribunal construes any provision or clause of this Section 5.3 to be illegal, void or unenforceable because of the duration of such provision or the area or subject matter covered thereby, such court, arbitrator or tribunal shall reduce the duration, area, or subject matter of such provision to the extent necessary to be enforceable, and, in its reduced form, such provision shall then be enforceable and shall be enforced

**5.3.6**  Seller agrees that (i) any breach by Seller of any of the provisions contained in this Section 5.3 would cause irreparable damage to the Buyer for which monetary damages and other remedies at law will not be adequate, and (ii) Buyer will be entitled to seek a restraining order, an injunction, specific performance or other form of equitable or extraordinary relief from any court of competent jurisdiction to restrain any threatened or further breach of this Section 5.3 or to require Seller to perform Seller's obligations under this Section 5.3 (without having to demonstrate actual harm or the inadequacy of legal remedies or posting any bond or other surety), which right to equitable or extraordinary relief will not be exclusive of, but will be in addition to, all other remedies to which Buyer may be entitled under this Agreement, at law, or in equity (including, the right to recover monetary damages). The agreement of Seller contained in this Section 5.3 is given as an inducement to, and as part of the consideration for, Buyer's purchase of the Purchased Assets under this Agreement.

**SECTION 5.4**  Confidentiality. The Seller Parties will treat and hold as confidential all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, or in the case of Seller's or Shareholder's consulting with Buyer following the Closing, in connection with such consulting in accordance with the policies of Buyer,

26

Exhibit 1

and deliver promptly to Buyer or destroy all tangible embodiments (and all copies) of the Confidential Information that are in their possession. In the event that any Seller Party is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information (the "**Disclosing Party**"), the Disclosing Party will promptly notify Buyer of the request or requirement prior to such disclosure so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.4. If, in the absence of a protective order or the receipt of a waiver hereunder, such the Disclosing Party is, on the advice of legal counsel, legally required to disclose any Confidential Information, the Disclosing Party may disclose such Confidential Information to the requesting authority; provided, however, that the Disclosing Party shall use commercially reasonable efforts to obtain, at the reasonable request of Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate.

**SECTION 5.5** Business Name. The Seller Parties covenant and agree not to use the names "Cool Frames," "CoolFrames," or any similar name for any entity owned or controlled by either Seller Party or the managers, or for any other business enterprise in which any Seller Party has an ability to control the name of the enterprise (except for the New Jersey Store), and promptly after the Closing (but in any event within two (2) Business Days after the Closing Date), Seller shall file an amendment to its organizational documents to reflect such change and provide satisfactory evidence thereof to Buyer. Seller agrees to rename the New Jersey Store within sixty (60) days of closing.

**SECTION 5.6** Guaranty of Seller Parties' Obligations. The Seller Parties hereby irrevocably and unconditionally guaranty to Buyer each and every obligation of Seller and the Seller Parties, including the full and punctual performance of and compliance with each and every covenant, indemnity, term and condition to be performed or complied with by any Seller Party under this Agreement. The guaranty set forth in this Section 5.6 is an absolute, present, primary and continuing guaranty of performance, payment and compliance. The Seller Parties acknowledge and agree that the Seller Parties liability under this Section 5.6 is joint and several, primary and absolute and, upon any default by any Seller Party, Buyer shall not be obligated to attempt enforcement first against any Seller Party. The Seller Parties hereby waive any and all defenses to enforcement of the guaranty set forth in this Section 5.6, now existing or hereafter arising, which may be available to guarantors, sureties and other secondary parties at law or in equity. The Seller Parties further agree to pay all reasonable costs and expenses, including reasonable attorneys' fees and related costs, incurred by Buyer in enforcing the guaranty set forth in this Section 5.6. Notwithstanding anything to the contrary hereinabove, the following provision shall supersede and control any conflicting language contained in this sub-paragraph 5.6:

Except as specifically provided for in this Agreement (i) Buyer shall take the Assets "as is" subject to their Due Diligence and Seller shall not be liable or bound in any manner by any verbal or written statements or representations relating to the following: (a) value of the business and/or Business assets; and (c) condition, value or extent of any inventory (the parties acknowledging Buyer's right to conduct a formal inventory prior to closing) except as provided for herein; and (ii) except as specifically provided for in this Agreement Buyer represents, warrants and acknowledges that it has entered into this Agreement on the basis of its own full investigation of all facts and

27

Exhibit 1

conditions underlying or relating to the Premises and the development and use of the Assets, including without limitation and that it has relied solely upon its own investigation.

SECTION 5.7 Books and Records. For a period of three (3) years following the Closing, Seller shall: (i) retain the books and records (including personnel files) of such Seller which relate to the Business and its operations for periods prior to the Closing; and (ii) upon reasonable advance notice, afford Buyer access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records for any purpose related to the Purchased Assets or the Business, including in connection with any proceeding arising therefrom or related thereto.

## ARTICLE VI
## INDEMNIFICATION; SET OFF

SECTION 6.1  Indemnification by Seller Parties. The Seller Parties (the "**Indemnifying Party**") shall jointly and severally indemnify Buyer and its respective successors and assigns, officers and directors (collectively, the "**Indemnified Parties**") and hold each of the Indemnified Parties harmless from and defend them each against any and all actions, suits, proceedings, demands, judgments, losses, costs, liabilities, damages and expenses, including, without limitation, reasonable out-of-pocket attorneys' and accountants' fees and disbursements (collectively, "**Damages**"), sustained or resulting directly from or arising directly out of (a) any breach or inaccuracy of any of the representations, warranties, covenants or agreements of the Indemnifying Party set forth in this Agreement or in any exhibit, schedule or other document delivered pursuant hereto, (b) the performance of any service or the sale of any product prior to the Closing by the Indemnifying Party or any predecessor of the Indemnifying Party, (c) the Indemnifying Party's ownership and operation of the Business or the Purchased Assets prior to the Closing, (d) any Liability of Seller, (e) any Liability of the Indemnifying Party arising out of the non-compliance with ERISA, and (f) any liability of the Indemnifying Party not expressly assumed by Buyer hereunder (g) failure by any Seller Party to perform any term or covenant set forth in this Agreement.  No right of indemnification hereunder shall be affected by any delay in giving notice to the Indemnifying Party unless, and then only to the extent that, the rights and remedies of the Indemnifying Party shall have been prejudiced as a result of the delay in giving such notice.  No right or remedy conferred in this Section is intended to be exclusive of any other right or remedy available, now or hereafter, at law, in equity or otherwise.  The Indemnifying Party acknowledges that Buyer is relying on the representations and warranties of the Indemnifying Party contained in this Agreement in deciding to purchase the Purchased Assets except as otherwise stated herein.

SECTION 6.2  Right of Set-off.  Buyer shall have the right to withhold and set off against any amount otherwise due to be paid to Seller pursuant to Section 2.5.2 (c), (i) any amounts that are known to be owed under Section 6.1, and (ii) the amount of any Damages to which any Buyer is entitled as an Indemnified Party under Section 6.1 (each a "**Buyer Claim**"). Buyer must provide supporting documentation of said amounts for which they claim are due under (i) & (ii) listed above and Seller shall have thirty (30) days from said notice to cure any claim under 6.1 before Buyer may withhold any payments due.

SECTION 6.3  Indemnification by Buyer.  Except as otherwise provided herein, from and after the Closing, Buyer shall protect, defend, indemnify and hold harmless Seller, its members,

Exhibit 1

managers, officers, employees and agents (collectively, the "Seller Indemnitees") from and against, all Losses incurred by any of the Seller Indemnitees resulting from, arising out of, relating to, or caused by: (i) any inaccuracy or misrepresentation in or breach of any of the representations, covenants, agreements or warranties of Buyer in this Agreement; (ii) any breach of any covenant or agreement to be performed by Buyer hereunder or the failure of Buyer to fulfill any obligation hereunder to be fulfilled by Buyerand (iii) any Assumed Liability or use of the Assets after the Closing.

**ARTICLE VII**
MISCELLANEOUS

**SECTION 7.1**  Transfer Taxes.  Seller shall pay all transfer, sales and similar taxes and recording and filing fees, if any, with respect to the transfer of the Purchased Assets.

**SECTION 7.2**  Successors and Assigns.  This Agreement will bind and inure to the benefit of the respective successors and assigns of the parties hereto, whether so expressed or not.

**SECTION 7.3**  Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

**SECTION 7.4**  Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

**SECTION 7.5**  Notices.  Any notices required, permitted or desired to be given hereunder shall be delivered personally, sent by nationally recognized overnight courier or mailed, registered or certified mail, return receipt requested, to the following addresses, and shall be deemed to have been received on the day of personal delivery, one business day after deposit with a nationally recognized overnight courier or three business days after deposit in the mail:

| | |
|---|---|
| If to Buyer: | Blessing Investment Group LG LLC<br>Attn: Dan Blessing<br>711 La Grange Drive<br>Lake Geneva, WI 53147<br><br>Email: blessingav@gmail.com |
| with a copy: | DKM&O Law, LLC<br>Attn: John E. O'Connor<br>11 S. Dunton Ave.<br>Arlington Heights, IL 60005<br>Email: joconnor@dkmolaw.com |

29

Exhibit 1

| | |
|---|---|
| If to Seller: | COOLFRAMES, LLC<br>Attn: [**insert**]<br>[**insert**]<br>Email: [**insert**] |
| with a copy to: | The Lehman Law Firm, PC<br>Jeffrey Lehman, Esq.<br>42 Throckmorton Lane<br>Old Bridge, New Jersey 08857<br>Email: jlehman@thelehmanlawfirm.com |
| If to Lee: | [**insert**] |
| If to David: | [**insert**] |

or to such other address as a Party may specify in a written notice given to the other Parties hereto.

**SECTION 7.6**  Governing Law.  All questions concerning the construction, validity and interpretation of this Agreement and the Exhibits and Schedules hereto shall be governed by the internal law, and not the law of conflicts of, the State of New York, and the performance of the obligations imposed by this Agreement shall be governed by the laws of the State of New York applicable to contracts made and wholly to be performed in such state.

**SECTION 7.7**  Exhibits and Schedules.  All Exhibits and Schedules hereto are an integral part of this Agreement.

**SECTION 7.8**  Final Agreement.  This Agreement, together with those documents expressly referred to herein, constitute the final agreement of the Parties concerning the matters referred to herein, and supersede all prior agreements and understandings, and may not be altered, modified, amended, or terminated, except in a writing signed by all of the Parties.

**SECTION 7.9**  Execution.  This Agreement may be executed in several counterparts and all such counterparts shall together constitute for all purposes one and the same instrument.  A copy of an executed consent may be delivered by facsimile or other electronic means (e.g., PDF), and any signature thereon shall be considered valid, binding, and original for all purposes.

**SECTION 7.10**  Waiver.  At any time prior to the Closing any Party hereto may extend the time for the performance of or waive compliance with any of the obligations or other acts of any other Party contained herein or waive any inaccuracies in the representations or warranties of the other Party contained herein or in any document delivered pursuant hereto.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Except as otherwise expressly provided herein, the provisions of this Agreement may be amended only by the written agreement of the Parties hereto.  Any waiver, consent or approval of any kind or character on the part of either Party hereto with respect to any provisions or conditions

Exhibit 1

of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such instrument.

**SECTION 7.11**  <u>Fees and Expenses</u>.  Except as otherwise expressly provided herein, each Party will bear all of its own expenses in connection with the preparation, execution and negotiation of this Agreement and the transactions contemplated hereby.

**SECTION 7.12**  <u>Performance.</u>  Time is of the essence of this Agreement.  Buyer or Seller shall pay all reasonable attorneys' fees and costs incurred by the prevailing party in enforcing the terms and provisions of this Agreement, including forfeiture or specific performance, in defending any proceeding to which Buyer or Seller is/are made a party as a result of the acts or omissions of the other party.

**SECTION 7.13** <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall in such event be deemed an original, but all of which together shall constitute one and the same instrument.  Any signature page delivered pursuant to this Agreement via email, fax or electronic signature is binding to the same extent as an original signature.

SECTION 7.14 Default By Purchaser.  If Purchaser shall default hereunder or breach any of the terms or provision of this Agreement not caused or resulting from default by Seller and such breach shall continue for ten (10) days after notice thereof from Seller, then Seller shall have the right to terminate this Agreement and retain the Deposit as liquidated damages and not a penalty or Seller shall have such other rights and remedies as may be available at law or in equity.

*(signature page to follow)*

Exhibit 1

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first set forth above.

**SELLER:**

COOLFRAMES, LLC, a New York limited liability company

By: Lee Weissman    David Weissman

Its:  Manager

**BUYER:**

Blessing Investment Group LG LLC

By: Dan Blessing
Its: Manager

32

Exhibit 1

Exhibit A

Assignment and Bill of Sale

33

Exhibit 1

**Bill of Sale**

Reference is hereby made to that certain that certain Asset Purchase Agreement ("Purchase Agreement") dated as of October __, 2025, by and among Blessing Investment Group LLC or its nominee ("Buyer"), COOLFRAMES, LLC, a New York limited liability company ("Seller"), Lee Weissman, individually ("Lee"), and David Weissman ("David"). Any term which is capitalized in this Bill of Sale, but not otherwise defined herein, shall be given the meaning ascribed to it in the Purchase Agreement.

Subject to the terms and conditions set forth in the Purchase Agreement, for good and valuable consideration received, the receipt and sufficiency of which are hereby acknowledged, the Seller has transferred, conveyed, and assigned to Buyer the Purchased Assets, and Seller hereby transfers, conveys, assigns, and contributes to Buyer, the Purchased Assets, to have and to hold the Purchased Assets unto Buyer, its successors, and assigns forever. Nothing in this Bill of Sale shall be deemed to modify or diminish any provision set forth in the Purchase Agreement, including, without limitation, any of the representations, warranties, covenants, and obligations set forth therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

Seller shall execute, or cause others to execute, any and all consents, acknowledgments, agreements, or documents necessary or appropriate to vest or evidence in Buyer good and valid title in and to any and all of the Purchased Assets. Seller hereby constitutes and appoints Buyer the true and lawful attorney of Seller with power of substitution, for Seller and in its place and stead, but on behalf of and for the benefit of Buyer, to demand, receive, and collect from time to time any and all of the Purchased Assets and to give receipts and releases for and with respect to the same, and in any part thereof, and from time to time institute and prosecute in the name of Seller any and all proceedings at law, in equity, or otherwise which Buyer may deem proper in order to collect, assert, protect, or enforce any claimed right or title of any kind in and to the Purchased Assets, and defend and compromise any and all actions, suits, or proceedings with respect to any thereof, and to do all such acts or things in the relation thereto as Buyer shall deem necessary. This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any applicable provisions regarding conflicts of laws.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Exhibit 1

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed and delivered by its duly authorized representatives, fully intending to be bound hereby.

Dated: October __, 2025

<strong>SELLER</strong>

COOLFRAMES, LLC, a New York limited liability company


_____
Lee Weissman , Manager and Member


_____
David Weissman , Manager and Member

Exhibit 1

<u>Exhibit B</u>

Sublease

34

Exhibit 1

## Commercial Sublease Agreement

This Commercial Sublease Agreement ("Agreement") is entered into as of nov 18, 2025, by and between COOLFRAMES, LLC, a New York limited liability company ("Sublandlord"), and BLESSING INVESTMENT GROUP LLC, a Wisconsin limited liability company ("Subtenant").

### 1. Premises and Term

Sublandlord hereby subleases to Subtenant the commercial premises located at 2907 Ocean Ave, Brooklyn, NY 11235 ("Premises"). The term of this Sublease shall commence on September 22, 2025, and shall continue on a month-to-month basis unless terminated earlier in accordance with Section 4.

### 2. Rent

Subtenant shall pay rent as follows:

a) No rent shall be due for the first six (6) months following the commencement of this Sublease (i.e., through March 31, 2026).

b) Beginning April 1, 2026, Subtenant shall pay a gross monthly rent of $1,800.00, due on the first day of each month.

### 3. Utilities and Maintenance

Subtenant shall be solely responsible for all utilities, internet, and telecommunications services consumed on the Premises during the term of this Sublease. Subtenant shall maintain the Premises in good condition, reasonable wear and tear excepted.

### 4. Termination

Subtenant may terminate this Sublease at any time upon giving at least sixty (60) days' prior written notice to Sublandlord.

### 5. Integration with Asset Purchase Agreement

This Sublease is executed pursuant to and in connection with that certain Asset Purchase Agreement dated August 10, 2025, between Sublandlord and Subtenant. In the event of a conflict between this Agreement and the Asset Purchase Agreement, the latter shall govern.

### 6. Insurance and Indemnity

Subtenant agrees to maintain general liability insurance for its operations on the Premises and to indemnify and hold harmless Sublandlord against any claims or liabilities arising from Subtenant's occupancy and use.

### 7. Governing Law

This Agreement shall be governed by the laws of the State of New York.

Exhibit 1

IN WITNESS WHEREOF, the parties have executed this Sublease as of the date first written above.

SUBLANDLORD:

COOLFRAMES, LLC

By: _____

Name: David Weissman
Title: Manager

SUBTENANT:

BLESSING INVESTMENT GROUP LLC

By: _____

Name: Dan Blessing
Title: Manager

Exhibit 1

## SCHEDULE 2.1(g)

Coolframes.com -domain

https://www.instagram.com/coolframeseyewear/

https://www.facebook.com/coolframeseyewear/mentions/?_rdr

https://www.tiktok.com/discover/cool-frames

https://www.youtube.com/channel/UCEsA_UNtOdv8TinwgQlXejQ

Exhibit 1

SCHEDULE 2.3

None

Exhibit 1

SCHEDULE 2.4(j)

NONE

35

Exhibit 1

SCHEDULE 2.5.3

Lab equipment 200,000.00
Inventory - frames and Lens 250,000.00
Software 2,500,000.00
Furniture 20,000.00
Supplies 5,000.00
Computers 100,000.00
Goodwill 2,675,000.00

Total 5,750,000.00.

36

Exhibit 1

SCHEDULE 3.1.3

None

Exhibit 1

SCHEDULE 3.1.5

See attached

38

Exhibit 1

*Exhibit 3.1.5*

# SWIGART
## LAW GROUP

July 31, 2025

CoolFrames, LLC
Attn: Legal Department
2907 Ocean Avenue
Brooklyn, NY 11235

### Notice of Dispute and Demand
### Protected Communication

*Re: C. Sanchez v. CoolFrames, LLC*
 *www.coolframes.com*

Please be advised that our client below has claims against your company for violation nof California privacy law. This letter is a notice of dispute and demand sent pursuant to the pre-arbitration notice of disputes section of your terms and conditions. A synopsis of our client's claims, detailed information on those claims, the applicable law, a demand, the basis of the demand, as well as further settlement discussion points are below.

### Claimant's Information
Cesar Sanchez ("Claimant")
Email: Sanchezaguilar.213@gmail.com

### Governing Law
Under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq ("CIPA"), a person whose communications are illegally tapped, read, or contents are learned is entitled to the following damages:

- $5,000 per violation, pursuant to Cal. Pen. Code § 637.2.

Courts have ruled that Cal. Penal Code § 631(a) of CIPA is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. See *Matera v. Google, Inc.*, 2016 WL 8200619 at *21 (N.D. Cal. 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.* 2006 WL 3798134 at *5-6 (N.D. Cal. 2006) (CIPA governs "electronic communications").

Under California common law, claims for intrusion upon seclusion and invasion of privacy involve a similar test, so courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (2020).

2221 Camino del Rio South, Ste. 308, San Diego, CA 92108
866-219-3343   619-728-6348   866-219-8344   josh@swigartlawgroup.com
WWW.SWIGARTLAWGROUP.COM

Exhibit 1

**Basis for Demand**

CoolFrames, LLC ("Respondent") utilizes tracking software, including a Meta Pixel, that allows Respondent to embed a JavaScript in the HTML code of Respondent's website that intercepts, tracks, stores, and analyzes Claimant's interactions with Respondent's website. By embedding the Meta Pixel within its website, Respondent aided Meta dba Facebook to intercept, store, and analyze Claimant's electronic communications for the purposes of data mining and targeted advertisement.

We downloaded the HTTP Archive Format ("HAR") file from Respondent's website which exposes the vast extent of wiretapping and data mining in which Respondent and its co-conspirator Meta engage. In addition to Meta, Respondent aids other companies in tapping and learning the contents of Claimant's electronic communications with Respondent's website.

Claimant realized this was occurring after finding a detailed list of interactions with Respondent's website in Claimant's personal Facebook account ("off-Facebook activity"). The interactions included Respondent's tracking analysis of Claimant's interactions, each labeled as an "Activity." The information found in Claimant's off-Facebook activity includes (1) Claimant's personalized ID number, (2) the date and time of the activity and (3) the event, or the activity itself (i.e. "Page View" or "Content"). The off-Facebook activity constitutes the tip of the iceberg of the information the Meta Pixel collects. The information in Claimant's Facebook account confirms Respondent embedded a Meta Pixel on Respondent's website which allowed Respondent and Meta to intercept, store, and analyze Claimant's communications for their commercial benefit. The images below depict two data sets which reveal just a snippet of the data obtained by Respondent and Meta by using Meta Pixel on Respondent's website.

Respondent utilizes the Meta Pixel to surreptitiously and covertly gather Claimant's electronic communications and data, which includes, but is not limited to: 1) a full-string, detailed URL for each page on Respondent's website that Claimant views and 2) the website folders and sub-folders on Respondent's web-server, which provides vast quantities of Claimant's data to Facebook. The Meta Pixel script embedded on Respondent's website allows both Respondent and Meta to surreptitiously tap and learn the contents of Claimant's electronic communications. This is the exact factual scenario of which Courts have been concerned; the surreptitious tapping and collection of user data for the purposes of future data mining and benefit.

The information Respondent aided Meta to intercept includes much more than Claimant's IP address and gives rise to serious invasions of privacy and inclusion upon seclusion claims. Respondent's invasion of Claimant's privacy occurred, as the Meta Pixel confirms, within milliseconds – a time where Claimant could not possibly read Respondent's Terms of Use and Privacy Policy, let alone agree to them.

Any alleged consent occurred well after the tapping began. The pixel spyware became active instantaneously upon visiting Respondent's site. Even if Claimant later consented to its use, it would have occurred well after the fact. Such was the case in *Javier v. Assurance IQ, LLC* where the Ninth Circuit rejected retroactive consent for tapping website users. *Javier v. Assurance IQ, LLC*, No. 21-16351 (9th Cir. May. 31, 2022)

2

Exhibit 1

## PROOF OF SERVICE BY MAIL

I live and work in the County of San Diego, State of California. I am over the age of 18 and not a party to this case. My business address is 2221 Camino Del Rio South, Suite 308, San Diego, California 92108.

On **July 31, 2025,** I served the following documents by First Class U.S. Mail on the person(s) below:

**ARBITRATION DEMAND**

Mailed to:

CoolFrames, LLC
Attn: Legal Department
2907 Ocean Avenue
Brooklyn, NY 11235

I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident of the county where the mailing occurred. The envelope or package was placed in the mail at 2221 Camino Del Rio South, Suite 308, San Diego, California 92108.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **July 31, 2025** in San Diego, California.

| Joanna Han | /s/ Joanna Han |
| --- | --- |
| (Type or print name) | (Signature) |

Proof of Service

Exhibit 1

Exhibit 1

Such an intrusion is highly offensive even to the most reasonable consumer considering that Respondent willingly chose to embed the script on Respondent's website thereby aiding Meta to tap and collected Claimant's communications in a matter of milliseconds. This is not a case where Respondent can claim that the information collected was just for its own private consumption and therefore can avail itself to any "party exception" which could apply. The Ninth Circuit, along with the First and Seventh Circuits have held that the simultaneous, unknown duplication and communication of "GET requests" like those at issue here do not exempt a defendant from liability under the "party exception." Additionally, the key distinction in this case, separate and apart from other claims that Respondent may face, is that Claimant's data was collected instantaneously by both Respondent and Meta for the sole purpose of having the data aggregated, and then independently used and sold.

The images below depict two data sets which reveal just a fragment of Respondent's and Meta's data collection through use of the Meta Pixel which occurs instantaneously when a consumer visits Respondent's website.



**Meta Pixel Helper**
Learn More

One pixel found on www.coolframes.com

 **Meta Pixel**
Pixel ID  1432790112509132 click to copy

Troubleshoot Pixel

Set up events

▼  PageView

WARNINGS

Pixel Helper found your Meta Pixel, but the pixel has not been activated for this event and no information has been sent to Meta. This may be due to an error in the code or if the pixel fires on a dynamic event. such as a button click. Follow the steps below to troubleshoot this issue

1. Try sending the desired event using the test events tool.
2. If the test events tool does not detect the event, there may be an issue with the Pixel Helper Implementation. Please review Meta Pixel implementation with your developer. Learn more

EVENT INFO

Setup Method  Manual
Pixel Code:  Hide

```
fbq("track", "PageView", {}, {eventID: "1741069679072_17410713
568203"})
```

Pixel Location | Hide

https://www.coolframes.com?zCountry=PH

Frame: Window

(Image confirms Respondent includes Meta Pixel(s) on Respondent's website)

3

Exhibit 1

By way of further explanation, what typically occurs when Claimant visits Respondents website is that Claimant's internet browser sends a GET request to Respondent's website server, which causes the website to send the information requested by Claimant to Claimant. This communication usually only occurs between the user's web browser and the website being viewed. But on Respondent's website, Respondent placed JavaScript code that allowed Respondent and Meta to track visitor activity by directing the user's browser to copy the referrer header from the GET request and send a separate, but identical, GET request and the associated referrer header to Meta's server. This is the conduct Claimant alleges is unlawful.

A sample of the precise data your client tapped and aided Meta to tap when Claimant visited Respondent's website is below. It was obtained by using Fiddler technology, a publicly available software which our expert will explain at the arbitration hearing.



The screenshot below provides a screenshot of the HAR file downloaded from Respondent's website and exposes the true extent of the data interception, collection, and dissemination in which Respondent engages. The screenshot is not of Claimant's interactions with Respondent's website; however, Claimant alleges the same data collection and dissemination occurred on the day(s) Claimant interacted with the website.

4

Exhibit 1



In this sample, Respondent's website received 17 GET requests from the browser with vasts amounts of information collected and disseminated within seconds. Of the 17 GET requests, Respondent sent countless GET requests to separate third parties which included, but were not limited to: Bing, Stripe.

**Settlement Demand**

Claimant's Facebook data shows that Respondent aided and conspired with Meta to tap and learn the contents of Claimant's sensitive and private electronic communications on at least three occasions within the last year. Claimant will testify to that at the arbitration hearing and the back-end data, confirmed by our expert, will support Claimant's testimony. Each such occasion constitutes a separate violation of Cal. Pen. Code § 631(a) with each violation allowing for $5,000 in statutory damages.

Exhibit 1

The image below depicts the off-Facebook activity found on Claimant's Facebook which confirms the three interceptions from Respondent's website.

**coolframes.com**

Generated by Cesar A Sánchez on Friday 31 January 2025 at 20:53 UTC-07:00
Contains data that you requested from 1 February 2024 at 17:15 to 31 January 2025 at 17:15

**coolframes.com**

Events

| ID | 1482790112508132 |
| Event | VIEW_CONTENT |
| Received on | Sep 23, 2024 12:10:00 pm |

| ID | 1482790112508132 |
| Event | PAGE_VIEW |
| Received on | Aug 26, 2024 11:52:00 am |

| ID | 1482790112508132 |
| Event | VIEW_CONTENT |
| Received on | Aug 25, 2024 10:35:00 pm |

6

Exhibit 1

Respondent's three interceptions results in a total of $15,000 in statutory damages under CIPA. Furthermore, through the GET requests sent to the two identified third-parties results in a total of $10,000 statutory damages under CIPA. Based on this information, the total amount in statutory damages amounts to $25,000. This is Claimant's opening settlement demand.

**Claimant's Statement and Signature**

I, Cesar Sanchez, hereby authorize CoolFrames, LLC to disclose my confidential information it has to Swigart Law Group, APC, as necessary to resolve my claims. Please do not contact me directly. All communications should be directed to my attorneys at Swigart Law Group, APC.

*/s/ Cesar Sanchez*
Cesar Sanchez

NOTICE:

We are sending this communication via email. A copy of this letter was also sent via mail when required. This serves as a written notice of dispute and impending arbitration, per Respondent's terms.

Sincerely,

*/s/ Joshua Swigart*
Joshua B. Swigart
Swigart Law Group, APC
2221 Camino Del Rio S, Ste 308
San Diego, CA 92108
Josh@SwigartLawGroup.com
P: 866-219-3343

7

Exhibit 1

Exhibit 1

SCHEDULE 3.1.1

None

39

Exhibit 1